848 A.2d 113

C. Delores TUCKER and William Tucker, her Husband,

v.

PHILADELPHIA DAILY NEWS, Phila. Newspapers, Inc.; Knight–Ridder, Inc.; Sports & Entertainment Litigation Reporter; Andrews Publications, Inc.; Legal Communication, Ltd.; Legal Intelligencer; Meridian Venture Partners, L.P.; Baseline II, Inc.; and the Entertainment Litigation Reporter.

Appeal of Phila. Daily News, Phila. Newspapers, Inc.; Knight–Ridder, Inc.; Legal Communications, Ltd.; Legal Intelligencer.

Supreme Court of Pennsylvania.

Argued Oct. 21, 2002.

Decided April 29, 2004.

Reargument Denied June 30, 2004.

602

Michael E. Baughman, Esq., Robert C. Heim, Esq., Amy B. Ginensky, Esq., for Phil. Daily News; Phila. News Papers, Inc.; Night–Ridder, Inc.

James William Gicking, Esq., Jonathan F. Ball, Esq., for Legal Intelligencer; Legal Communications, LTD.

Richard C. Angino, Esq., for C. Delores Tucker and William Tucker.

Before: ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## OPINION

Justice NEWMAN.

Today, we consider the extent to which Pennsylvania libel law can permissibly restrict the free expression rights [1] of

---

**1.** The First Amendment to the Constitution of the United States provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

Appellant-newspapers[2] to print what they deem appropriate. The issues presented force us to examine when a statement is capable of a defamatory meaning and to set forth the boundaries demarcating where concern for the protection of the reputations[3] of public figures in Pennsylvania must yield to the need for an open discussion of their involvement in public

U.S. CONST. amend. I (applied to the states by U.S. CONST. amend. XIV, § 1). The Constitution of the Commonwealth of Pennsylvania provides, in pertinent part:

> The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.

Pa. Const. Art. I, Section 7.

2. For ease of discussion, we refer to the *Philadelphia Daily News*, Philadelphia Newspapers, Inc., Knight–Ridder, Inc., *Legal Communications, Ltd.*, and the *Legal Intelligencer* collectively as Appellant-newspapers. On February 5, 1999, C. Delores Tucker and her husband, William Tucker (hereinafter, "the Tuckers") discontinued their actions as against Andres Publications, Inc., the *Sports & Entertainment Litigation Reporter*, and the *Entertainment Litigation Reporter*. (Reproduced Record (R.R.) R.R. 109a 112a). The Tuckers also discontinued their action as against defendant Meridian Venture Partners, L.P. (R.R. 113a.) The *Philadelphia Daily News* and the *Legal Intelligencer* published articles at issue in this appeal. It appears that Philadelphia Newspapers, Inc., Knight–Ridder Inc., and Legal Communications, Ltd. are named Appellant because they are affiliated with the *Philadelphia Daily News* or the *Legal Intelligencer* and not because they published separate articles about Mrs. Tucker's lawsuit.

3. Recently, the U.S. Supreme Court poignantly summarized the importance of the interests protected by state defamation law with a quote from Shakespeare's *Othello:*

> Good name in man and woman, dear my lord, Is the immediate jewel of their souls. Who steals my purse steals trash; 'Tis something, nothing; 'Twas mine, 'tis his, and has been slave to thousands; But he that filches from me my good name Robs me of that which not enriches him, And makes me poor indeed.

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 12, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (quoting WILLIAM SHAKESPEARE, OTHELLO act III, sc. 3); *Kernick v. Dardanell Press*, 428 Pa. 288, 236 A.2d 191, 193 (1967) (citing same quote in the context of a defamation action but pointing out that: "The law stands as a guardian to protect a man's good name earned in the heat of battle, in the sweat of work, and in the laboratory of conscience, but it cannot prescribe hospitalization for abrasions or order surgery for a hiccough.").

affairs. "In cases where that line must be drawn, the rule is that we examine for ourselves the statements in issue and the circumstances under which they were made to see ... whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect." *New York Times Co. v. Sullivan*, 376 U.S. 254, 285, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (internal citations and quotations omitted). To that end, we begin by reviewing the facts and procedural history of this case.

## Facts and Procedural History

Appellee C. Delores Tucker (Mrs. Tucker) is a well-known public figure [4] who, from 1993 through 1997, led a high-profile "crusade" against "gangsta rap" music. R.R. 26a, R.R. 62a. Mrs. Tucker's campaign is undeniably one of public concern.

In February of 1996, Interscope Records distributed the album "All Eyez on Me," in which deceased rapper Tupac Shakur responded to Mrs. Tucker's "attack" [5] on gangsta-rap with the songs "Wonda Why They Call U Bitch" and "How Do U Want It." [6] The lyrics conjure images of prostitution, and

4. According to her Complaint in this case, Mrs. Tucker has served as: the Secretary of State of the Commonwealth of Pennsylvania; the Chair of the National Political Congress of Black Women, Inc.; the Chair of the Democratic National Committee Black Caucus; President of the Martin Luther King Jr. Association for Non Violent Change; President of the National Federation of Democratic Women; member of the NAACP SCF Board of Trustees; and a member of the boards of directors of three Pennsylvania colleges. (R.R. 23a–24a.)

5. In the instant defamation action against Appellant-newspapers, Mrs. Tucker alleged that her lawsuit against the record industry "attacks the words in 'All Eyez on Me' " and "attacks the corporate and business Defendants for bankrolling and getting rich from gangsta rap generally, and 'All Eyez On Me' particularly." (R.R. 32a.)

6. The Daily News quoted the following portions of the lyrics of those songs as follows:
*Wonda Why They Call U Bitch*
"Wonda why they call U b—
Dear Ms. De[L]ores Tucker
Keep stressen me
f—with a muthaf—mind .
I figured you wanted to know
You know

assert that Mrs. Tucker was only interested in money and had sold-out black interests to white politicians.

On July 21, 1997, Mrs. Tucker and her, husband, William Tucker[7] (hereinafter the "Tuckers") filed suit against the Estate of Tupac Shakur[8] and entities associated with the production, distribution, and sale of his music in the United States District Court for the Eastern District of Pennsylvania. *Tucker v. MTS, Inc. t/a Tower Records et al.*, No. 97 CV 4717 (E.D.Pa. filed July 21, 1997) (hereinafter, *Tucker II*).[9] The

> Why we call them hos b—
> And maybe this might help you understand
> It ain't personal
> Strictly business baby
> Strictly business
> So If you wonder why we call U b—
> You wonder why we call U b—
> *How Do U Want It*
> De[L]ores Tucker
> You's a muthaf—
> Instead of tryin' to help a ni—
> You destroy a brotha
> Worst than tha others
> Bill Clinton
> Mr. Bob Dole
> You too old to understand tha
> way tha game is told
> you're lame
> So I gotta hit you with tha high facts
> Won't someone listen?
> Makin' millions
> ni—, top that
> They wanna censor me
> They ratha see me in a cell
> Livin' in hell
> With only a few of us to live to tell
> Now everybody talken about us
> I could give a f—
> I'd be tha first one to bomb and cuss
> Ni—, tell me how you want it."
> (R.R. 44a (editing in original).)

7. The Tuckers issued a July 31, 1997 press release describing Mr. Tucker as a "well-known businessman."

8. According to the August 4, 1997 Legal Intelligencer article, Mr. "Shakur was shot as he rode in a car near the Las Vegas Strip Sept. 7. He died six days later at a local hospital."

9. The dispute between the parties did not begin with this case. Indeed, since August 1995, the parties have filed several actions against one

*Tucker II* Complaint alleged that the production, distribution, and sale of records including "All Eyez on Me," caused Mrs. Tucker to fear for her life and suffer emotional distress. Mrs. Tucker demanded damages in an amount exceeding $10,000,000.00.[10] Additionally, in paragraph fifty of the *Tucker II* Complaint, Mr. Tucker claimed that "as a result of his wife's injuries, [he] suffered a loss of advice, companionship and consortium." (R.R. 64a.)

On July 31, 1997, Mrs. Tucker issued a press release explaining that she filed the Complaint in *Tucker II*, which she described as "a multi-million dollar suit directed at the heart of the gangsta rap music in the US[sic]." (R.R. 72a.) The press release indicated that Mrs. Tucker had received death threats and that she would continue to fight against gangsta rap music in spite of them because she was "even more concerned about the many, many young lives that have already been lost needlessly and the little children who will be lost if [she did] not say . . . to this industry—'STOP NOW.'" (R.R. 73a.) The press release also notes, without further explanation, that Mrs. Tucker's "husband, William, a well known businessman, joins her as a plaintiff in the suit." *Id.*

■ The case before us arose because the Tuckers claim to have been defamed by the way in which several newspapers reported on *Tucker II*. Specifically, on July ·29, 1998, the Tuckers commenced the current action (hereinafter, *Tucker IV*[11]) against Appellant-newspapers alleging that they had

another. The first legal salvo was fired by Interscope Records and alleged, *inter alia*, that Mrs. Tucker's anti gangsta-rap activities induced a breach of contract between Death Row Records and Interscope. *Interscope Records v. Tucker*, 95 CV 5444 (C.D.Cal.1995) (hereinafter, *Tucker I*). After the District Court dismissed the contractual interference claim, Interscope and Death Row voluntarily discontinued the action. The Tuckers then commenced *Tucker II* against record industry entities.

10. The claims in *Tucker II* were also eventually dismissed. *Tucker II*, aff'd, 229 F.3d 1139, No. 99–1169 (3d Cir. filed July 17, 2000) (dismissing case as to all defendants except the Estate of Shakur on statute of limitations grounds and dismissing claims against the Estate because lyrics were expressions of opinion and not defamatory).

11. The Tuckers also sued *Newsweek, Time*, and the attorney for the Estate of Shakur, whom *Newsweek* and *Time* quoted in their articles.

defamed the Tuckers since they interpreted the loss of consortium claim in *Tucker II* to include a claim for damage to the sexual relationship between the Tuckers.

> The *Newsweek* and *Time* articles, like the articles that are the subject of the case at bar, reported on the Tuckers' claims, including the loss of consortium claim, against the record industry. *Tucker v. Fischbein*, 97 CV–6150 (E.D.Pa.1997) (hereinafter, *Tucker III*) (*Tucker v. Fischbein*, 1999 WL 124355 (E.D.Pa.1999) (granting summary judgment in favor of all defendants)), *aff'd in part and rev'd in part*, 237 F.3d 275 (3d Cir.2001) (affirming the grant of summary judgment with regard to the media defendants finding that the Tuckers had failed to prove actual malice but reversing and remanding for further proceedings with regard to claims against Mr. Fischbein).
>
> We question whether the doctrine of collateral estoppel, also known as issue preclusion, bars the Tuckers from relitigating the claims before this Court that the federal courts disposed of in *Tucker III*. We have explained that:
>
>> a plea of collateral estoppel is valid if, 1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on the merits, 3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, and 4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action.
>
> *Safeguard Mutual Insurance Co., v. Williams*, 463 Pa. 567, 345 A.2d 664, 668 (1975). As the Tuckers had their claims dismissed in *Tucker III*, collateral estoppel could properly be asserted against them if all four of the foregoing requirements were met. It is clear that the Tuckers chose the forum and that they had a full and fair opportunity to litigate the issues in question. It also cannot be disputed that the judgment in *Tucker III* was a final judgment on the merits and that the Tuckers were a party to the action. However, at this juncture, it is not clear that the issues are identical because, at the preliminary objection stage, we cannot determine whether the statements in the articles were the same and we cannot determine whether the circumstances surrounding the publication of the articles were the same. That is, we do not know what notice the Tuckers provided to Appellant-newspapers and we do not know whether the conduct and knowledge of the reporters in the various cases were the same. Accordingly, at this juncture, the doctrine of issue preclusion does not bar the Tuckers' claims.
>
> Concurrent with the filing of the current action (which we refer to as *Tucker IV*) against Appellant-newspapers, the Tuckers commenced another suit in the United States District Court for the Eastern District of Pennsylvania against more than one hundred media entities alleging that they, too, defamed the Tuckers in articles that characterized the *Tucker II* loss of consortium claim as including a loss of sexual relations between the Tuckers. *Tucker v. Los Angeles Times*, Civ. No. 98–3948 (E.D.Pa.1998) (hereinafter, *Tucker V* ). That action is apparently stayed pending our disposition of this case.

Because the issues in this case require us to determine whether the Tuckers have established a defamation cause of action against Appellant-newspapers, it is essential that we review the content of the articles they published. We now address them.

## The Allegedly Defamatory Articles

On August 2, 1997, a picture of Mrs. Tucker and Mr. Shakur appeared on the front page of the *Philadelphia Daily News* with a headline, which read, "A *DIRTY RAP* Suit v. Shakur estate says 'vile' lyrics ruined her rep—and her sex life." The headline for the *Philadelphia Daily News* article was "Suit: Tupac dead wrong" with a sub-headline, which read, "Rights leader says rapper's strong words ruined her life." [12] Two

12. The text of the article read:

C.De[L]ores Tucker has filed a $10 million lawsuit against Tupac Shakur's estate, saying some of the late rapper's lyrics caused her mental anguish and diminished her sex life.

Tucker filed the lawsuit this week in Philadelphia federal court charging that Shakur's record-breaking 1996 CD "All Eyez on Me" caused her "great humiliation, mental pain and suffering."

"She was really called a lot of bad names," said Tucker's Harrisburg attorney, Richard C. Angino: "It was all done to intimidate her."

It also says the injuries caused her husband, William, to "suffer a loss of advice, companionship and consortium."

Richard Fischbein, a New York attorney who is co-administrator of Shakur's estate, said he is baffled by the suit.

"It is hard for me to conceive how these lyrics could destroy her sex life," Fischbein said. "But we can only wait for the proof to be revealed in court."

Tucker and her husband took particular offense at the "lewd" and "indecent" references in two songs titled, "Wonda Why They Call U B—" and "How Do U Want It," the suit says.

In one song, which the suit claims alludes to prostitution, the lyrics state: "Got your legs up trying to get rich. Keep you head up and your legs closed, dear Ms. C. De[L]ores Tucker."

"Tupac was just one of the instruments that participated in slandering Dr. Tucker," Angino said.

He said such companies as Death Row Records, Interscope Records, Time Warner, Seagram and Tower Records—all named as defendants in the suit—are also responsible."

"These companies make billions of dollars putting out music that destroy[s] African–Americans," Angino said.

In filing the lawsuit, Tucker said that over the years she has tried to stop the production and distribution of gangsta rap to "impressionable youth, because it tends to corrupt the morals of minors."

days later, on August 4, 1997, The *Legal Intelligencer* also reported on the Tuckers' federal lawsuit against the record companies. The headline read "Gangsta Rap Critic Sues Shakur Estate For Album's Derogatory References."[13] The

> She contends it "contains vile, profane, obscene and indecent lyrics which glorify drugs, violence and illicit sex."
> Tucker, head of the Washington-based National Political Congress of Black Women, formed an anti-rap campaign that gained wide-spread support from such notables as former U.S. Education Secretary William Bennett; U.S. Sen. Joseph Lieberman, D. Conn.; former Republican presidential nominee Bob Dole and retired Gen. Colin Powell.
> In January 1996, she began an organized protest of Tower Records in Philadelphia because the store was selling Shakur's "All Eyez on Me" to minors.
> Kathleine Diange, administrative assistant for the South Street Tower Records store, remembers when Tucker and her entourage protested outside the record store forcing it to close briefly.
> "They were reading the obscene lyrics off of the CD through a bullhorn outside of the store," Diange recalled. "Then, they came into the store and started to throw the CDs on the ground."
> The police were called and Tucker was arrested.
> "I think she blew the situation out of proportion." Diange said.
> Tucker, a former secretary of state for Pennsylvania, has been harshly condemned by some black intellectuals for aligning herself with right-wing political leaders to fight gangsta rap.
> Tucker's lawyer defended her tactics, saying "Here is a woman who has spent her lifetime caring about her people, and now these record companies are trying to make her life miserable."
> "This is the woman who marched with Martin Luther King to fight for integration, and now she is fighting a new battle against gangsta rap."
> Since the record's release, her lawyer said Tucker has received death threats and now fears for her life. She also has incurred medical expenses, suffered a loss of life's pleasures and has lost the freedom to travel freely.
> "Tucker has reasonable fear for her life because violence and death play a central role in the gangsta rap arena," the lawsuit states. Calls were placed to Interscope Records, Death Row Records, and Time Warner, but no one was available for comment.
> (R.R. 44a–45a.)

13. The text of the article was as follows:

> A woman who built a national reputation for criticizing the violent lyrics of gangsta rap has sued the estate of Tupac Shakur, saying one of his albums made derogatory references to her.
> C. De[L]ores Tucker filed the suit last week in Philadelphia federal court, claiming, among other things, that the anguish caused by the lyrics diminished her sex life with her husband.

Tuckers allege that these articles are defamatory because they reported that the Tuckers sought damages because the lyrics diminished their sex life. (R.R. 50a.)

## The Tuckers' Defamation Claim

Mrs. Tucker claims that Appellant-newspapers ignored her press release and focused instead on the "sensationalize[d] ... sexual 'spin' " provided by the attorney for the Estate of Shakur. She alleges that the newspapers "distorted and misrepresented [her] Complaint as being one where she brought a $10 million lawsuit only because lewd lyrics destroyed her sex life ... [and that they] misrepresented and/or falsely represented that the July 21, 1997, [*Tucker II*] Complaint is a lawsuit wherein [the Tuckers] aver that Tupac Shakur's lewd lyrics had affected or destroyed the Tuckers' sex life." (R.R. 32a–33a.) Central to her claim is a contention that, "the defendants have slandered and defamed [her and her husband] by making [them] objects of ridicule in the

Shakur's "All Eyez on Me"—a 1996 double CD that sold nearly five million copies—caused Mrs. Tucker "great humiliation, mental pain and suffering," according to the lawsuit.

It also says the injuries caused her husband, William, to "suffer a loss of advice, companionship and consortium."

Mrs. Tucker, who is asking for $10 million in the suit, could not be reached for comment Thursday.

Richard Fischbein, a New York attorney who is co-administrator of the estate said he is baffled by the suit.

"It's hard for me to conceive how these lyrics could destroy her sex life," Fischbein said. "But we can only wait for the proof to be revealed in court."

Tucker and her husband, William, took particular offense at the "lewd" and "indecent" references in two songs titled, Wonda Why They Call U B____" and "How Do U Want It," the suit says. In one song, which the suit claims alludes to prostitution, the lyrics state: "Got your legs up trying to get rich. Keep your head up and your legs closed, dear Ms. C. De[L]ores Tucker."

The suit also names Shakur's wife, Afeni, Death Row Records, Interscope Records, Time Warner, Seagram Co., Tower Records and seven other people and entities as defendants.

Tucker, head of the Washington-based National Political Congress of Black Women, formed an anti-rap campaign in 1994 with former U.S. drug czar William Bennett.

Shakur was shot as he rode in a car near the Las Vegas Strip Sept. 7. He died six days later at a local hospital.

(R.R.50a–51a.)

world, and ... with knowledge [of the falsity] or reckless disregard of the truth ... of the articles." (R.R. 38a–39a.) Accordingly, in this case, Mrs. Tucker and her husband demanded compensatory damages in the amount of $1 million for current and future medical expenses, mental pain and suffering, inconvenience, loss of life's pleasures, humiliation, and embarrassment. They also sought punitive damages in amounts sufficient to prevent the Appellant-newspapers from publishing future articles similar to the ones at issue in the instant case. (R.R. 39a.)

### Dismissal of the Tuckers' Claims by the Philadelphia Court of Common Pleas and Their Reinstatement by the Superior Court

On March 19, 1999, in the Philadelphia Court of Common Pleas (trial court), Appellant-newspapers filed Preliminary Objections to the Complaint of the Tuckers. Appellant-newspapers argued to the trial court that the Complaint should be dismissed because: "(1) the [newspapers'] Article[s] and the statements contained therein, are not capable of a defamatory meaning as a matter of law; (2) [the Tuckers] have failed to satisfy the pleading standard of actual malice to support their claim for defamation or their prayer for punitive damages; and (3) the Article[s], even if defamatory, [are] protected by the media's long-standing privilege to publish fair and accurate accounts of judicial proceedings." (R.R. 117a–118a.) The trial court sustained the Preliminary Objections and dismissed the Complaint. First, the court agreed with the argument of the Appellant-newspapers that the articles are not capable of a defamatory meaning. The court explained:

Based on the information set forth in the complaint and relevant case law, Tucker has failed to state a cause of action for defamation. She has not presented evidence that her reputation was actually damaged, only that she feels ridiculed when people ask her about the *Shakur* case. She does not contend that people have stopped asking her to speak at public engagements or provide other indicators that her position in the community has diminished. The only harm that Tucker alleges is that people question her

about the lawsuit. Her embarrassment from the questions does not rise to the level of harming her reputation or deterring third parties from associating with her. Because Tucker's complaint failed to show any defamation resulted from the publication of their articles, the Defendants' Preliminary Objections are properly sustained.

*Tucker v. Legal Communications, Ltd.,* No. 3644, slip op. at 6 (C.P. Phila. Co. filed June 16, 1999) (footnote omitted). The trial court also accepted the argument of Appellant-newspapers that the Tuckers had failed to prove actual malice because they "provided no evidence that the authors had knowledge that their statements were false or acted with reckless disregard for the truth." *Id.* at 7. Indeed, the court found that the statements were not false because the definition of consortium includes sexual relations. *Id.* at 7–8. The trial court also agreed with the argument of Appellant-newspapers that, because the articles, taken as a whole, were fair and accurate and were not published for the sole purpose of causing harm to the Tuckers, the report was protected by the fair reporting privilege. *Id.* at 8–9.

The Superior Court reversed and remanded for further proceedings. It determined that: (1) the articles were capable of a defamatory meaning; (2) the Tuckers were not required to prove actual malice at the pleading stage; and (3) the issue of whether the fair reporting privilege was abused was an issue for a jury to decide.[14] *Tucker v. Philadelphia Newspapers,* 757 A.2d 938 (Pa.Super.2000). The Superior Court believed that the implication of the articles—that the Tuckers, who hold themselves out as moral people, are "overly concerned with sexual matters [—] could be capable of a defamatory meaning." *Id.* at 944. Also, the Superior Court agreed with the Tuckers' argument that Appellant-newspapers' "emphasis ... on the one possible component of a loss of consortium claim, to the exclusion of the other ingredients, creates an impression that will expose the Tuckers to public

14. Appellant-newspapers did not request leave to appeal the issue of whether the fair reporting privilege insulates them from liability and we do not address it.

hatred and ridicule." *Id.* at 943. The court also accepted the contention of the Tuckers that "because of their advanced age and their reputation as people of strong morals, the suggestion in the newspaper articles that the Tuckers are overly concerned with sexual matters could be capable of defamatory meaning." *Id.* at 943–44. The Superior Court ultimately held that determining whether the articles were published with knowledge of their falsity or reckless disregard for the truth requires an analysis of the state of mind of the authors and publishers, which the Superior Court agreed should not occur at the pleading stage. Accordingly, the Superior Court reversed the trial court and remanded the case for further proceedings.

Appellant-newspapers filed a petition for allowance of leave to appeal, which we granted. Appellant-newspapers formulated the issues as follows:

1. Is the statement that [the Tuckers] filed a lawsuit[,] which asserts, *inter alia,* a claim for loss of consortium, including damage to their sex life, capable of a defamatory meaning?

2. Can [the Tuckers] recover for defamation for publication of true information about a lawsuit, when the United States Supreme Court and this Court have repeatedly held that, under the First and Fourteenth Amendments, in order for a statement to be actionable in defamation, it must be false?

We address those issues *seriatim.*

## Discussion

### Issue I: Defamatory Meaning

 Our initial inquiry concerns whether the statement that the Tuckers' claimed $10,000,000.00 in compensation for damage to their sexual relationship was capable of a defamatory meaning. "In an action for defamation, the plaintiff has the burden of proving ... [t]he defamatory character of the communication." 42 Pa.C.S. § 8343(a). "It is the function of the court to determine whether the challenged publication is

capable of a defamatory meaning. If the court determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial." *Thomas Merton Center v. Rockwell International Corp.*, 497 Pa. 460, 442 A.2d 213, 215–16 (1981).

To determine whether a statement is capable of a defamatory meaning, we consider whether the statement "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him." *Birl v. Philadelphia Elec. Co.*, 402 Pa. 297, 167 A.2d 472, 475 (1960) (quoting RESTATE-MENT (FIRST) OF TORTS, § 559 (1989)). "Libel is the malicious publication of printed or written matter which tends to blacken a person's reputation and expose him to public hatred, contempt or ridicule." *Schnabel v. Meredith*, 378 Pa. 609, 107 A.2d 860, 862 (1954); *see also Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 273 A.2d 899, 904 (1971) (same). "The court must view the statements in context." *Baker v. Lafayette College*, 516 Pa. 291, 532 A.2d 399, 402 (1987).

[W]ords which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable. Thus, we must consider the full context of the article to determine the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.

*Thomas Merton*, 442 A.2d at 216 (internal citations and quotations omitted). "It is not enough that the victim of the [statements] ... be embarrassed or annoyed, he must have suffered the kind of harm which has grievously fractured his standing in the community of respectable society." *Scott–Taylor, Inc. v. Stokes*, 425 Pa. 426, 229 A.2d 733, 734 (1967).

We have demonstrated a willingness to dismiss defamation claims where we have determined that the offending statements were not capable of a defamatory meaning. *Baker*, 532 A.2d at 402, 403 (affirming grant of summary judgment be-

cause the statements in letters to the college provost that: (1) the department chairman "consider[ed the professor's presence in] classes to be an extraordinary, peculiar, and academically deplorable arrangement[;]" and (2) that the chairman had reported that the professor was "cavalier in his dealings with students [demonstrating] . . . a general attitude that the best way to build a program is by giving high grades[;]" were not capable of defamatory meanings); *Thomas Merton*, 442 A.2d at 214–15 (dismissing complaint, as not capable of defamatory meaning, that alleged that an Associated Press article conveyed the impression that the members of the Thomas Merton Center were Communists by stating that the Soviets were funding opposition to the B–1 bomber project and identifying the Center as a group opposed to the project that may have unknowingly received Soviet financing); *Clark v. Allen*, 415 Pa. 484, 204 A.2d 42 (1964) (sustaining grant of preliminary objections dismissing defamation claim arising out of a letter expressing shock that U.S. Senator's voting record indicated that he had "Communist tendencies"); *Scott–Taylor*, 229 A.2d at 733 (statement of Chairman of Board of Supervisors indicating concern that proposed new building project would end up like a project owned by plaintiff that the Chairman stated looked like a chicken coop—dismissed on preliminary objections despite averment that Chairman made the statements maliciously, knowing they were false and with intent to harm the owner).

However, as the Third Circuit recently pointed out, we have found other statements capable of conveying defamatory meaning. *Tucker III*, 237 F.3d at 282–83 (3d Cir.2001). In *Tucker III*, the Third Circuit considered statements that appeared in *Newsweek* and *Time* virtually identical to ones Appellant-newspapers made in the instant case, and predicted, based on the law of Pennsylvania, that we would view the statements as capable of a defamatory meaning. The court based its position on two cases, *Cosgrove Studio & Camera Shop, Inc. v. Pane*, 408 Pa. 314, 182 A.2d 751 (1962), and *Birl*, which Appellant-newspapers contend are distinguishable.

*Cosgrove* involved a dispute between competing camera shops. The plaintiff shop advertised that it would provide a free roll of film for every roll it developed. The defendant shop responded with its own advertisement advising the public that "you get nothing for nothing" and that the defendant shop would not:

> 1. inflate the prices of developing your film to give you a new roll free! 2. Print the blurred negatives to inflate the price of your snapshots! 3. Hurry up the developing of your valuable snapshots and ruin them! 4. Use inferior chemicals and paper on your valuable snapshots.

*Cosgrove*, 182 A.2d at 752. We held that the statement was capable of a defamatory meaning because the advertisement "clearly imputes, to the person to whom it refers, characteristics and conduct which are incompatible with the proper and lawful exercise of a business." *Id.* at 753. Because we had previously held that "any language which unequivocally, maliciously and falsely imputes to an individual or corporation want of integrity in the conduct of his or its business is actionable[,]" we allowed the case to proceed. *Id.* at 754.

Similarly, in *Birl*, we held that statements made by the Philadelphia Electric Company (PECO), Birl's former employer, to his current employer, were capable of a defamatory meaning. There, a PECO sales manager contacted the current employer of Birl and told him that PECO would not do business with Birl because Birl had left his employment with PECO without notice. Apparently, business with PECO was important to Birl's current employer, which told him that it would discharge him if PECO did not reverse its position. PECO refused and Birl was discharged. He sued for defamation and tortious interference with contractual relations and the trial court dismissed both counts on preliminary objections. The Superior Court affirmed. We reversed, holding that both claims should have been allowed to proceed further. As to the defamation claim, we held that the statements of PECO were capable of a defamatory meaning because people who heard the statement, "could reasonably conclude that Birl lacked honor and integrity and was not a person to be relied

upon insofar as his business dealings were concerned." *Birl,* 167 A.2d at 476. Although we agree with the argument of Appellant-newspapers that *Birl* and *Cosgrove* are distinguishable because they considered situations in which it was indisputable that an issue existed as to whether the statements imputed a "want of integrity in . . . business," *Cosgrove,* 182 A.2d at 754, that does not end our analysis.

The question for us is whether the statements of Appellant-newspapers tended to harm the reputation of the Tuckers so as to tarnish their "reputation and expose [them] to public hatred, contempt or ridicule." *Schnabel,* 107 A.2d at 862.

In *Tucker III,* the Third Circuit applied Pennsylvania law to the *Newsweek* and *Time* articles and concluded that the statement that the Tuckers had sued for $10 million because the lyrics damaged their sex lives was capable of a defamatory meaning. The court stated:

Reading the statements at issue in this case in context and looking at the impression that they were likely to engender in the minds of the average reader, we conclude that each is capable of a defamatory meaning. Mrs. Tucker has led a campaign against the immorality of gangsta rap and those who profit from it. The statements made by the defendants—to the effect that Mrs. Tucker and her husband brought a $10 million lawsuit because Shakur's lyrics damaged their sex life—carry numerous disparaging implications. Because of the inherent implausibility of the idea that lyrics alone could cause millions of dollars of damage to a couple's sexual relationship, the statements were capable of making the Tuckers look insincere, excessively litigious, avaricious, and perhaps unstable. Furthermore, the statements tended to suggest that the Tuckers are hypocritical, that after condemning the gangsta rap industry for profiting from pornography, the Tuckers were only too willing to open up their own sex life for public inspection in order to reap a pecuniary gain. In the more colloquial language used by the defendants themselves, the statements suggested that the Tuckers were "[g]rabbing [a]t a [d]ead [s]tar['s]" "[b]ooty" and were willing to take the witness stand at trial

and publicly provide the testimony about their sex lives that Fischbein "[couldn't] wait to hear." Such statements were capable of lowering the Tuckers' reputation in the eyes of the community and of causing others to avoid associating with them.

*Tucker III,* 237 F.3d at 282–83 (3d Cir.2001).-It is known that married people have sexual relations, and it is not generally defamatory to report that they do so. However, it may be defamatory to state falsely that a husband has sued to recover ten million dollars for loss of sexual relations as a result of the lyrics of two songs. Such a statement could make the Tuckers seem overly interested in money or sex, and not concerned with their life work of fighting for civil rights. It is possible to conclude that such a false statement would cause people to decline to associate with the Tuckers.

We also recognize that this is still the pleading stage. There has been no discovery. Therefore, we cannot know the full effects of the statement. We can only be guided by the pleadings, which allege that the articles "made the Tuckers objects of ridicule in the world ... [and that the Tuckers] cannot go anywhere or do anything without friends, relatives, acquaintances, and even strangers questioning the[m] ... as to why they brought such a ridiculous law suit." (R.R. at 38a–40a.) The Complaint does not specifically state that the Tuckers "suffered the kind of harm which has grievously fractured [their] standing in the community of respectable society." *Scott–Taylor,* 229 A.2d at 734. It does not state that the statements harmed their "reputation and expose[d] them] to public hatred, [or] contempt...." *Schnabel,* 107 A.2d at 862. However, it does put Appellant-newspapers on notice that the Tuckers have brought a defamation claim against them and have suffered damages measured by the allegation that the articles have held them out for ridicule in the world. Therefore, the Complaint, albeit barely, alleges that the statements are capable of a defamatory meaning and, at this point in the proceedings, we so find.

## Issue II: Constitutional Limits on State Defamation Law

Having determined that the statements may be capable of a defamatory meaning, and are not subject to dismissal on preliminary objections, we turn to the second question at issue in this case. That is, whether the First Amendment, as applied to the states by the Fourteenth Amendment, precludes the Tuckers from recovering in their defamation action. It cannot be disputed that the Complaint in *Tucker II* included a claim for loss of consortium and that, by definition, a loss of consortium claim includes a claim for loss of sexual relations. Consortium is defined as "the legal right of one spouse to the company, affection, and assistance of and to sexual relations with the other." *Machado v. Kunkel*, 804 A.2d 1238, 1244 (Pa.Super.2002) (quoting Webster's Collegiate Dictionary, 10th Edition (1998)). More generally, consortium means:

> "Conjugal fellowship of husband and wife, and the right of each to the company, society, co-operation, affection, and aid of the other in every conjugal relation." BLACK'S LAW DICTIONARY 309 (6th ed.1990). A claim for loss of consortium arises from the marital relationship and is based on the loss of a spouse's services resulting from an injury.

*Cleveland v. Johns–Manville Corp.*, 547 Pa. 402, 690 A.2d 1146, 1149 (1997). Accordingly, there can be no dispute that the definition of consortium includes a claim for damage to the sexual relationship of a married couple. Indeed, the Tuckers admit as much.[15]

Because Appellant-newspapers reasonably relied upon the plain meaning of consortium and the conclusion of the attorney for the Estate of Shakur that the Tuckers were suing for loss of sexual companionship, Appellant-newspapers ask how can they be held liable for making a true statement. Clearly, if the newspapers printed a true statement, they could not be

---

15. The Tuckers quote BLACK'S LAW DICTIONARY 958 (7th Ed.1999) as defining loss of consortium as "[a] loss of the benefits that one spouse is entitled to receive from the other, including companionship, cooperation, aid, affection, and sexual relations...." Brief of Appellees at 20. Although the Tuckers admit that a loss of consortium claim may include a claim for loss of sexual relations, they assert that it almost never does include such a claim and that in this case it did not.

held liable in a defamation action. *New York Times,* 376 U.S. at 279–280, 84 S.Ct. 710.

The issue, as formulated by Appellant-newspapers, assumes that there is no dispute that the statement, "the Tuckers are suing the record companies because the lyrics of Shakur songs damaged their sex life," is true. However, the Tuckers claim that Appellant-newspapers published the articles with knowledge that the statements were false and/or with reckless disregard for the truth. (R.R. 38a.) Specifically, the Tuckers allege that some of the newspapers actually knew, before they printed the articles, that the Tuckers were not suing for loss of sexual relations because, they claim, their attorney communicated that information to the newspapers. (R.R. 36a.) The Tuckers also claim that Appellant-newspapers acted with reckless disregard of the truth because some of them allegedly: (a) failed to contact the Tuckers' lawyers; (b) relied upon the biased statement of the attorney for the Estate of Shakur; (c) failed to research the background of the Tuckers; (d) failed to obtain the *Tucker II* Complaint; (e) failed to read it; (f) ignored the Tuckers' press release regarding *Tucker II;* (g) and/or failed to properly investigate the facts of the article. (R.R. 34a–38a.)

### Actual Malice

To prevail on their defamation claim, the Tuckers, as public figures, must prove, by clear and convincing evidence that the allegedly defamatory statements were false and that Appellant-newspapers either knew they were false or recklessly disregarded their falsity.[16] *Milkovich,* 497 U.S. at 15, 110 S.Ct. 2695. United States Supreme Court cases discussing the First Amendment outline the federal constitutional limits of state defamation law. We now review that law.

In the early 1960s, the struggle of African Americans for equality and against racism was at a defining moment. African-Americans organized and sought to publicize their work. On March 29, 1960, the *New York Times* published a public

---

**16.** The Tuckers apparently admit that they are public figures and that they must prove that Appellant-newspapers published the articles with actual malice. (R.R. 119a.)

information statement, created by the Committee to Defend Martin Luther King and the Struggle for Freedom in the South, that included several statements that turned out to be incorrect concerning police handling of Alabama race relations. Because at the time Alabama law [17] was such that a statement imputing misconduct to a public official was presumed to be false unless the defendants could prove that the statement was true, all the jury had to conclude to award expression-inhibiting damages in *New York Times v. Sullivan* was that the defamatory statement was of and concerning the plaintiff. The state court jury so concluded and awarded a county commissioner the sum of $500,000.00. *New York Times*, 376 U.S. at 256, 84 S.Ct. 710.

The U.S. Supreme Court reviewed the award in *New York Times v. Sullivan* and announced that it violated constitutional protections of free speech and press. The Court explained the reasons why a federal court was justified in limiting state defamation law. The Court began with a discussion of an unconstitutional federal statute,[18] the Sedition Act, which limited speech by prohibiting false statements about the United States, the Congress, or the President.[19]

17. Pennsylvania common law was similar. A person's good character was presumed; therefore, our courts presumed that a defamatory statement was false. Additionally, to escape liability, defendants had the burden of proving that the presumptively defamatory statement was true. *Hepps v. Philadelphia Newspapers, Inc.*, 506 Pa. 304, 485 A.2d 374, 378 (1984) *rev'd*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986).

18. Despite the fact that no one directly challenged the Sedition Act before the U.S. Supreme Court, it has been roundly criticized and is accepted as being unconstitutional. *New York Times*, 376 U.S. at 276, 84 S.Ct. 710. President Jefferson "pardoned those who had been convicted and sentenced under the Act and remitted their fines, stating: 'I discharge every person under punishment or prosecution under the sedition law, because I considered, and now consider, that law to be a nullity, as absolute and as palpable as if Congress had ordered us to fall down and worship a golden image.'" *Id.* (quoting Letter to Mrs. Adams, July 22, 1804, 4 Jefferson's Works (Washington ed.), pp. 555, 556). His view "reflect[ed] a broad consensus that the Act, because of the restraint it imposed upon criticism of government and public officials, was inconsistent with the First Amendment." *Id.*

19. The Sedition Act of 1798 provided for the imposition of a penalty "if any person shall write, print, utter or publish . . . any false, scandalous

The Sedition Act was a federal criminal statute that unconstitutionally limited free speech. However, the issue in *New York Times* was whether state libel law had an unconstitutionally chilling effect on free expression. The Court explained that the repressive effect of a criminal statute, like the Sedition Act, and an overly broad state defamation law was quite similar,[20] noting that "what a State may not constitutionally bring about by means of a criminal statu[t]e is likewise beyond the reach of its civil law of libel." *New York Times*, 376 U.S. at 277, 84 S.Ct. 710. Therefore, the Court observed that states may not use their defamation laws to limit speech to the extent it would impermissibly restrict the exercise of First Amendment rights.

The Court then rejected the argument that a defendant's defense of truth should quell all fears that civil laws will hamper the free exchange of ideas. Indeed, the Court believed that requiring a defendant to prove the truth of the matter with regard to comments about public officials in their public capacities was not sufficient to protect First Amendment concerns and would result in self-censorship. It explained:

> [A] rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to ... self-censorship. Allowance of the defense of truth,

and malicious writing or writings against the government of the United States, or either house of the Congress ... or the President ..., with intent to defame ... or to bring them, or either of them, into contempt or disrepute; or to excite against them, or either or any of them, the hatred of the good people of the United States." *New York Times*, 376 U.S. at 273–274, 84 S.Ct. 710 (quoting the Sedition Act of 1798, 1 Stat. 596).

**20.** Indeed, the Court pointed out that the law of defamation could pose even greater burdens upon free expression for several reasons. Civil penalties can be very large indeed and can subject the same newspaper to liability for every article it writes that is deemed defamatory. Additionally, with regard to state defamation law, there is no provision for double jeopardy and proof is by a preponderance of the evidence not beyond a reasonable doubt. It is, therefore, clear that civil limitations on speech can be just as chilling on the free exchange of ideas as criminal laws.

with the burden of proving it on the defendant, does not mean that only false speech will be deterred.... Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which steer far wider of the unlawful zone. The rule thus dampens the vigor and limits the variety of public debate. It is inconsistent with the First and Fourteenth Amendments.

*Id.* at 279, 84 S.Ct. 710 (internal citations and quotations omitted). To protect the freedoms of speech and press, the Court determined that safeguards in addition to offering a defendant the defense of proving truth were necessary. The Court then articulated the actual malice standard as follows:

The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

*Id.,* at 279–80, 84 S.Ct. 710. Thereafter, a newspaper no longer had to prove that the offending statement was true to defend against a defamation action so as to give the First Amendment protections "breathing space" from censorship. *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). A public official who feels he or she was defamed with regard to a matter of public concern not only has the burden of proving that the statement was false but that the newspaper either knew the statement was false or printed it with reckless disregard of its falsity. *Id.*

The U.S. Supreme Court has since extended the actual malice standard from public officials to public figures, like the Tuckers. *See Curtis Publishing Co. v. Butts,* 388 U.S. 130, 162, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (and *Associated*

*Press v. Walker*, 389 U.S. 889, 88 S.Ct. 13, 19 L.Ed.2d 198 (1967), which the court resolved in the same opinion).[21]

The U.S. Supreme Court has also rejected "the common-law presumption that defamatory speech is false" and has, in its place, set forth "a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages." *Hepps*, 475 U.S. at 777, 106 S.Ct. 1558 (holding unconstitutional our Court's determination that the defendant had the burden of proving the truth of its statement). The U.S. Supreme Court has, therefore, held that it would have an unconstitutionally chilling effect on speech for a state to require a defendant to prove the truth of a matter of public concern even if a public figure is not involved.[22]

### Application of Actual Malice Standard to the Claim of the Tuckers

The Tuckers allege that, at the pleading stage, it is unreasonable for them to have to prove actual malice because they contend that it involves an assessment of the state of mind of the defendant, a fact, which requires discovery to establish. It is true that there are instances in which the U.S. Supreme Court and this Court have declined to dismiss a pleading prior to trial because a factual dispute with regard to a component of actual malice made it premature to do so. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 521, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (reversing grant of summary judgment; "at this stage, the evidence creates a jury question whether [the writer of the article] published the statements with knowledge or reckless disregard" of the falsity of the statements); *Curran v. Philadelphia Newspapers, Inc.*, 497 Pa. 163, 439 A.2d 652 (1981) (summary judgment

---

21. In *Curtis,* the Court applied the actual malice standard to the football coach for the University of Georgia and in *Walker* to a former General's role in a University of Mississippi riot.

22. The U.S. Supreme Court has declined to expand the application of the actual malice standard from public officials to private individuals who speak about a matter of public concern. *Gertz v. Welch,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

motion disputing claim of actual malice granted in part and denied in part).

However, the requirement that the plaintiff be able to show actual malice by clear and convincing evidence is initially a matter of law. *Milkovich,* 497 U.S. at 17, 110 S.Ct. 2695. " 'The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law.' " *Id.* (quoting *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 685–86, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989)). *See also Ertel v. Patriot–News Company,* 544 Pa. 93, 674 A.2d 1038 (1996) (holding trial court's grant of summary judgment proper because the plaintiff could not show actual malice by clear and convincing evidence). Indeed, in *Harte–Hanks,* the U.S. Supreme Court explained that:

> This rule is not simply premised on common-law tradition, but on the unique character of the interest protected by the actual malice standard. Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of breathing space so that protected speech is not discouraged. The meaning of terms such as actual malice—and, more particularly, reckless disregard—however, is not readily captured in one infallible definition. Rather, only through the course of case-by-case adjudication can we give content to these otherwise elusive constitutional standards. Moreover, such elucidation is particularly important in the area of free speech for precisely the same reason that the actual malice standard is itself necessary. Uncertainty as to the scope of the constitutional protection can only dissuade protected speech—the more elusive the standard, the less protection it affords. Most fundamentally, the rule is premised on the recognition that *"[j]udges, as expositors of the Constitution,"* have a duty to *"independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.' "*

*Harte–Hanks,* 491 U.S. at 685–686, 109 S.Ct. 2678 (emphasis added, internal citations and some quotations omitted) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 511, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)). Accordingly, we must consider whether a reasonable jury could conclude by clear and convincing evidence that Appellant-newspapers printed statements they knew were false or printed them with reckless disregard of their falsity.

The standard to be applied upon review of a motion for judgment on the pleadings accepts all well-pleaded allegations of the complaint as true. " 'The question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it.' " *MacElree v. Philadelphia Newspapers, Inc.,* 544 Pa. 117, 674 A.2d 1050, 1054 (1996) (quoting *Vattimo. v. Lower Bucks Hospital, Inc.,* 502 Pa. 241, 465 A.2d 1231 (1983)). Accordingly, we consider the actual malice standard to determine whether, assuming the allegations of the Complaint are true, the Tuckers' action should be remanded for further proceedings or dismissed.

Essentially, the Tuckers claim that, notwithstanding that the Complaint in *Tucker II* alleged a loss of consortium claim, Appellant-newspapers knew that the Tuckers were not seeking damages for loss of their sexual relationship or printed the statement with reckless disregard of its falsity. Specifically, they contend that they can prove actual malice because the Tuckers' attorney purportedly told some of the newspapers that the Tuckers were not suing for loss of sexual relations and Appellant-newspapers recklessly disregarded this warning and published their interpretation anyway. (R.R. 36a.) The Tuckers also claim that Appellant-newspapers acted with reckless disregard of the truth because some of them allegedly: (a) failed to rely on the best sources; (b) relied upon the biased statement of the attorney for the Estate of Shakur; (c) failed to research the background of the Tuckers; (d) ignored the Tuckers' press release regarding *Tucker II;* and/or (e) failed

to properly investigate the facts of the article. (R.R. 34a–38a.) The Tuckers, therefore, contend that they have set forth sufficient allegations of actual malice to avoid judgment on the pleadings.

Several of the Tuckers' allegations are based upon an incorrect understanding of the articles the Appellant-newspapers published. For example, the Tuckers contend that the Appellant-newspapers showed actual malice by describing the *Tucker II* Complaint as one in which the Tuckers: (1) only sued the Shakur Estate, and (2) were seeking $10 million only because lewd lyrics destroyed their sex life. However, neither the *Philadelphia Daily News* nor the *Legal Intelligencer* made either of these statements. The *Philadelphia Daily News* article makes it clear it did not allege that the Tuckers only sued Mr. Shakur. Indeed, it quoted the Tuckers' attorney as stating that the Tuckers also sued the companies that produce, distribute, and sell the subject records. (R.R. 44a–45a.) Similarly, the *Legal Intelligencer* article made it clear that "[t]he suit also names Shakur's Wife, Afeni, Death Row Records, Interscope Records, Time Warner, Seagram Co., Tower Records and seven other people and entities as defendants." (R.R. 50a–51a.)

The Tuckers' next allegation that Appellant-newspapers stated that the Tuckers "were seeking $10 million only because lewd lyrics destroyed [their] sex life" is also not correct. Both Appellant-newspapers pointed out that the Tuckers were suing for other things, too. The *Philadelphia Daily News* article stated that Mrs. Tucker suffered mental anguish, great humiliation, and mental pain and suffering, and that she was suing, in part, "to stop the production and distribution of gangsta rap to 'impressionable youth, because it tends to corrupt the morals of minors.' " (R.R. 44a (quoting Mrs. Tucker).) The article reported that Mrs. Tucker alleged that she was slandered and that she "has reasonable fear for her life because violence and death play a central role in the gangsta rap arena." Although the *Legal Intelligencer* article did not give as many details about the other relief sought by the Tuckers, it stated that the lawsuit sought relief for other

things, including damages for "humiliation, mental pain and suffering" because of the lyrics of the songs on the "All Eyez on Me" album. (R.R. 50a.)

The Tuckers also contend that the purported failure of Appellant-newspapers to consider the Tuckers' press release was evidence of actual malice. (R.R. 34a.) Appellant-newspapers properly demurred to this statement. The Tuckers cannot prove actual malice based on their belief that Appellant-newspapers should have paid more attention to the Tuckers' press release especially where the release did not deny that the Tuckers sought damages for diminished sexual relations. Indeed, the press release stated that Mrs. Tucker's "husband, William, a well known businessman, joins her as a plaintiff in the suit." (R. 72a.) The press release did nothing to dispel the belief of Appellant-newspapers that the loss of consortium claim included a claim for loss of sexual relations.

The Tuckers further allege that the newspapers demonstrated actual malice by mischaracterizing the Complaint by emphasizing the sexual "spin" of Richard Fischbein. (R.R. 34a, 36a.) We do not find any basis from which a jury could conclude that Appellant-newspapers acted recklessly or in knowing disregard of the truth in reliance on the statement of Mr. Fischbein. In fact, the newspapers acted reasonably in quoting Mr. Fischbein. As an attorney and the executor of the Estate of Shakur, he is an entirely appropriate person for the newspapers to have interviewed. He was not an unreliable source and reliance upon him is not evidence of actual malice. *Curran*, 439 A.2d at 660. Additionally, the emphasis on the "spin" of Mr. Fischbein to attract some of the more prurient interests of the public is not defamatory. "An action for defamation cannot be premised solely on defendant's style or utilization of vivid words in reporting a judicial proceeding . . . . [an article does not become actionable] by reason of the alleged 'flippant' and 'smart alecky' style of writing which was utilized . . . to create reader interest." *Binder v. Triangle Publications, Inc.*, 442 Pa. 319, 275 A.2d 53, 58 (1971) (internal quotations and citations omitted). Although an article is not made defamatory by being unfair, the *Philadelphia Daily*

*News* acted in an even handed manner by extensively quoting the attorney for the Tuckers in response to the comments of Mr. Fischbein. *See* R.R. 44a–45a.

Similarly, despite the fact that the *Legal Intelligencer* did not quote the Tuckers' attorney, it, too, was entitled to rely on the statements of Mr. Fischbein and the definition of the word "consortium." The *Legal Intelligencer* did report that "Mrs. Tucker, who is asking for $10 million in the suit, could not be reached for comment Thursday[,]" implicitly advising the reader that there may be another perspective to this story. Apparently, the *Legal Intelligencer* did not have the benefit of an interview with Mrs. Tucker, so it relied upon the Complaint and the other sources available. The fact that the newspapers did not interview Mrs. Tucker does not mean that they knew that the statement of Mr. Fischbein was false, nor does it create the inference that Appellant-newspapers had "obvious reasons to doubt the veracity" of his statements, especially where the *Tucker II* Complaint appeared to validate them. *St. Amant*, 390 U.S. at 732, 88 S.Ct. 1323.

Next, the Tuckers allege that:

Only a few of the Defendants contacted Plaintiffs' law firm, which attorneys drafted the complaint, and the few defendants who did contact Plaintiffs' law firm misrepresented the complaint even after talking with Plaintiffs' counsel and after being advised that consortium counts *can* include a claim for damage to one's sexual life, but no such claim was being made by the Tuckers.

(R.R. 36a) (emphasis in original). This is a problematic allegation for Appellant-newspapers because, to the extent that they were told that the Tuckers' loss of consortium claim did not include a claim for damage to the Tuckers' sexual relationship or recklessly disregarded that fact, it would be possible for a jury to conclude that Appellant-newspapers printed the article with actual malice. The plaintiff is the master of his claim. If the plaintiff unequivocally denies that he or she is making a claim, and that information is communicated to a newspaper,

the fact that the newspaper stated that the plaintiff was making such a claim could be evidence of actual malice.[23]

In *Tucker III*, the Tuckers made a similar claim, that their attorney told *Time* and *Newsweek* that the loss of consortium claim in *Tucker II* did not include an allegation of loss of sexual relations. However, despite the allegation, the Tuckers' attorney admitted that he made no such statement. "When asked exactly what he said to put [the *Newsweek* reporter] on notice that the Tuckers' claim did not involve impairment of sexual relations, Mr. Angino replied: 'I said only in the rarest of cases would you have a count that actually involves sex. *I'm under oath, so I cannot say to you that I said specifically, this case does not involve sex.*'" *Tucker III*, 237 F.3d at 286 (3d Cir.2001) (emphasis in original). It is also worthy of note that the *Newsweek* article was printed on August 20, 1997, eighteen days after the *Philadelphia Daily News* article and sixteen days after the *Legal Intelligencer* article. Accordingly, it appears that, if Mr. Angino could not state under oath that he told the *Newsweek* reporter that the *Tucker II* Complaint did not involve a claim of loss of sexual relations, it is unclear whether he told Appellant-newspapers in this case.[24]

**23.** However, in other situations, where the plaintiff's position is not determinative of an issue, the communication of a denial by a plaintiff is not usually evidence of actual malice. "As one court has stated, '(i)f potential plaintiffs in libel suits could cut off a(no) malice defense simply by calling a newspaper and giving a broad denial of the article, the first amendment policy in *New York Times* would be undermined.'" *Curran*, 439 A.2d at 660 (internal citations omitted).

**24.** We also note that the concurring and dissenting opinion of Judge Nygaard in *Tucker III* observed that there is evidence that the Tuckers in fact intended for their Complaint to include a claim for loss of sexual relations. Summarizing the evidence in paragraph form, Judge Nygaard noted:

I. In his deposition, the Tuckers' attorney, Mr. Angino, stipulated that at the time the suit was commenced, the original complaint itself provided no indication that a claim for interference with sexual relations was *not* being pursued, and that someone reading the Tuckers' complaint might assume that it alleged damage to sexual relations....

II. Mr. Angino also admitted in his deposition that when the suit was initiated, *he* was *not* sure whether the Tuckers sought recovery for damage to their sexual relations. He stated that "the purpose of

632

█ Additionally, the Tuckers' Complaint in this case is ambiguous at best. It alleges that Mr. Angino told "a few" of the defendants in the case that the *Tucker II* Complaint did not include a loss of sexual relations claim. (R.R. 36a.) It is

the consortium count was to cover everything ... every way in which Mr. Tucker was affected, every way." The record does not contain any facts to the contrary.

III. The Tuckers themselves have failed to state, either in their depositions or in affidavits, that they had ruled out any facet of their consortium claim at the time they originally filed it.

\* \* \*

VI. After observing the media's reaction to the consortium claim, Mr. Tucker had the opportunity in at least three separate interviews to clarify that he and his wife were not seeking compensation for injury to their sexual relations. Instead, Mr. Tucker confirmed in all three interviews that interference with sexual relations was indeed an element of their claims.

VII. On August 13, 1997, in an interview with *Philadelphia Weekly*, Mr. Angino had a similar opportunity to clearly state for the public record that the Tuckers were foregoing any claims stemming from interference with sexual relations. However, Mr. Angino failed to do so. Instead, he stated that loss of consortium "is a standard addition to lawsuits of this type and refers to *all aspects* of the marital relationship, not necessarily sex."

VIII. On August 21, 1997, the Tuckers issued yet another press release. It again failed to disavow any claim arising out of Mr. Tucker's impotency or injury to the Tuckers' sexual relationship. Instead, the release confirmed the existence of such a claim and expressed the Tuckers' frustration that too much of the media's attention was focused on that aspect of the case: " 'All the media gleefully jumped on the so-called sex part in the suit that called attention to loss of consortium, which was put in there by my husband Bill, not by me,' [Mrs. Tucker] added, obviously nettled."

IX. The Tuckers have admitted that neither they, nor Mr. Angino, nor anyone on their behalf, ever called Fischbein, at any time, to correct his misunderstanding of the Tuckers' loss of consortium claim.

The Tuckers have failed to provide *any* evidence, other than the language in their Amended Complaint, to suggest that they did not intend to claim loss of sexual relations. Instead, it is obvious to me that the statements made by the Tuckers and their attorney were deliberately cagey and equivocal so that they could, if they wished, introduce evidence of impotence and sexual dysfunction at trial.

*Tucker III*, 237 F.3d at 289–290 (3d Cir.2001) (Nygaard, J. concurring and dissenting) (internal citations omitted)(emphasis in original). Indeed, there is evidence that the Tuckers did not know what their claim included because the Tuckers' attorney "never discussed the loss of consortium claim with the Tuckers." The *Tucker II* Complaint was "drafted by a law student" and the Tuckers' attorney "did not even sign it, nor is it clear from the record that he even read the final draft. His wife (who is not an attorney) signed it for him." *Id.* at 290, n. 7.

not clear that the allegation of knowledge relates to these Appellant-newspapers. The Preliminary Objections of the *Philadelphia Daily News* asserted that the Complaint of the Tuckers should be dismissed because it "fails to adequately inform the defendants of the charges against them." (R. 131a.) It argued that the Complaint was insufficiently specific to meet the pleading requirements of Pa.R.C.P. 1028(a)(3). We agree.

We cannot know from the pleading whether the remaining Appellant-newspapers were among the newspapers Mr. Angino asserted he spoke with, especially because several newspapers were dismissed from the action. More generally, there is no way a court can possibly evaluate a pleading to determine if it states a cause of action if it is so vague that the court cannot determine whether the plaintiffs allege to have given the defendants important notice. Here we do not know whether the attorney for the Tuckers claims to have actually told Appellant-newspapers that the loss of consortium claim did not include a loss of sexual relations allegation and we are unable to conclude that he did based upon the current pleading. However, in the event that the Tuckers are able to show that they unequivocally communicated the foregoing information to Appellant-newspapers, the Tuckers would have stated a viable cause of action. *See Curtis Publishing,* 388 U.S. at 169–170, 87 S.Ct. 1975 (observing that where "little investigative effort was expended initially, and no additional inquiries were made even after the editors were notified by respondent and his daughter that the account, to be published was absolutely untrue [and i]nstead the [newspaper] proceeded on its reckless course with full knowledge of the harm that would likely result from publication of the article ... [the evidence discloses] ... [a] reckless disregard for the truth...."). However, because the pleading is impermissibly vague, we dismiss it with leave to replead only in the event that the Tuckers are able to allege, in good faith, that their attorney unequivocally told these specific Appellant-newspapers that the loss of consortium claim did not include a claim for loss of sexual relations.

The Tuckers also assert that Appellant-newspapers were reckless in not knowing that the *Tucker II* Complaint did not seek to recover for damage to the Tuckers' sex lives for several additional reasons, none of which is sufficient to prove actual malice by clear and convincing evidence. The Complaint in this case alleges that Appellant-newspapers recklessly disregarded the truth by failing to do research into Mr. and Mrs. Tucker's background, including their ages, years of marriage, religious and moral upbringing, and their emphasis on privacy. (R.R. 38a.) Additionally, the Tuckers allege that Appellant-newspapers acted recklessly by failing to follow selected rules of journalistic ethics including: (1) not relying on biased sources; (2) failing to rely on the best sources; (3) not sensationalizing the news; and, (4) failing to check the sources and accuracy of the stories. *Id.*

It is clear that a showing of "[a] 'reckless disregard' for the truth ... requires more than a departure from reasonably prudent conduct." *Harte–Hanks*, 491 U.S. at 688, 109 S.Ct. 2678. Failure to check sources, or negligence alone, is simply insufficient to maintain a cause of action for defamation. Recklessness generally and in the context of actual malice is not easily shown. As we have explained:

> The [United States] Supreme Court has emphasized that the question of whether a statement has been published with reckless disregard of falsity is not measured by whether a reasonably prudent man would have [published], or would have investigated before publishing. Rather, (t)here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Thus, while recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports it simply cannot be concluded that a defendant entertained the requisite doubt as to the veracity of the challenged publication where the publication was based on information a defendant could reasonably believe to be accurate.

*Curran*, 439 A.2d at 660 (internal citations and quotations omitted). The allegations of recklessness against Appellant-

newspapers, at best, present a situation in which one could conclude that perhaps it would have been better if Appellant-newspapers asked the Tuckers or their attorney directly whether their loss of consortium claim included a claim for damage to their sexual relationship. However, while hindsight may be twenty-twenty, this failure does not constitute actual malice. Indeed, it may not rise to the level of negligence.

### Conclusion

For the foregoing reasons, the determination of the Superior Court is affirmed in part and reversed in part, and the Tuckers' Complaint is dismissed. The Tuckers are granted leave to replead only to the extent they are able to allege that, before Appellant-newspapers printed the articles, the Tuckers or their representative unequivocally told Appellant-newspapers that their loss of consortium claim did not include a claim that the lyrics damaged their sex lives. "The right to amend should not be withheld where there is some reasonable possibility that amendment can be accomplished successfully." *Otto v. American Mut. Ins. Co.*, 482 Pa. 202, 393 A.2d 450, 451 (1978). In the event that the Tuckers are able to allege notice to Appellant-newspapers, the Tuckers will have stated a cause of action. Based on their current pleading, however, this defamation action is dismissed.

Former Chief Justice ZAPPALA did not participate in the decision of this case.

Justice SAYLOR files a concurring opinion.

Justice NIGRO files a concurring and dissenting opinion in which Justice CASTILLE joins.

### *CONCURRING OPINION*

Justice SAYLOR.

I join the majority opinion, except for its determination that a cause of action would be stated upon the filing of an amended complaint alleging some unequivocal communication

to Appellant-newspapers that the Tuckers' loss of spousal consortium claim did not include a claim for loss of sexual relations. Since the *Tucker II* Complaint was filed as of record and contained a boilerplate claim for loss of consortium, which, by definition encompassed a claim for damage to the Tuckers' sexual relationship, in my view, knowledge on the part of Appellant-newspapers of some greater demonstrated commitment on the part of the Tuckers to a more restricted damages claim would be necessary to implicate the kind of reckless disregard for the truth essential to a defamation claim in the present circumstances.

## CONCURRING AND DISSENTING OPINION

Justice NIGRO.

I join the majority insofar as it reasons and concludes that the published statement that the Tuckers claimed $10 million for damages to their sexual relationship was capable of a defamatory meaning. However, I disagree with the majority's decision to dismiss the Tuckers' complaint with leave to re-plead "only in the event that the Tuckers are able to allege, in good faith, that their attorney unequivocally told these specific Appellant-newspapers that the loss of consortium claim did not include a claim for loss of sexual relations." Op. at 633, 848 A.2d at 135. In my view, at this early stage in the proceedings, before any discovery has even taken place, the majority places too great a burden on the Tuckers to plead specific facts underlying their claim of actual malice and, as a result, prematurely limits the facts on which they will be permitted to rely. As the Superior Court below recognized, "proving actual malice calls into question the state of mind of the one who published the allegedly defamatory statement and, therefore, the issue is not one that readily lends itself to summary disposition." 757 A.2d 938, 945–46 (Pa.Super.2000). Given that reality, I would simply overrule the preliminary objections regarding actual malice and would give the Tuckers the opportunity in discovery to uncover facts other than those

already available to establish the Appellant-newspapers' reckless disregard for the truth.

Justice CASTILLE joins.