## Miller v. York Newspapers Inc.

C.P. of Dauphin County, no. 2004 CV 1732.

*Richard D. Sprague,* for plaintiff.

*Terence J. Barna* and *Amy B. Ginensky,* for defendants York Newspapers, MediaNews, Fisher and Hough.

*Gayle C. Sproul,* for defendant Buckner News.

TURGEON, *J.,* January 28, 2005—Currently before the court are the defendants' preliminary objections seeking dismissal of a defamation action brought by the plaintiff, a public official. For the reasons set forth below, the preliminary objections are sustained and the defamation action dismissed.

## BACKGROUND

On June 29, 2003, the *York Sunday News* published an editorial titled "State police sex scandal," under the "Our views" section of the paper. The substance of the publication was that the Pennsylvania State Police was in the midst of a scandal involving sex discrimination and abuse claims within its ranks. The editorial stated that the Pennsylvania State Police Commissioner at the time, plaintiff Colonel Jeffrey Miller, had confirmed that between 1995 and 2001, 163 allegations of sex abuse complaints had been made against the state police, 68 of which were substantiated. An attorney representing a woman in a lawsuit against the police believed that the problem within the Pennsylvania State Police was systemic while Miller believed the problem was the result of a "few bad apples," and thought the charges of a broader problem were "nonsense." The editorial opined that Col. Miller's institution of a zero-tolerance policy in substantiated cases should be vigorously pursued. Colonel Miller had admitted, however, that in the past, the punishment meted out by the state police in miscon-

duct cases had "eroded" since supervisors believed, with some merit, that harsh punishment and firing would be overturned by arbitrators. The editorial noted the need for reform of the state arbitration rules and concluded:

"The arbitration problem is no excuse for the state police brass going easy on rogues, though. They should play hardball in arbitration cases, even if they ultimately lose. Meanwhile, Miller, who used to head up the state police legislative affairs office, should start lobbying for arbitration reform.

*"But he shouldn't be handling the probe into these misconduct cases.*

*"Why? Because he himself was the subject of a sex discrimination case. A female employee in the legislative office recently won $277,000 in a suit disputing her firing by Miller. She claimed the office had turned into an old boys club.*

*"If this is true, can the president of that club really be expected to conduct a thorough 'zero tolerance' probe?*

"Gov. Ed Rendell is right to appoint an outsider to investigate the situation." (Complaint, exhibit A.) (emphasis added)

Plaintiff asserts that the highlighted portions of the editorial are defamatory. (Complaint ¶12.)

The lawsuit referred to in the article was one brought by Barbara Wilhelm, who had been employed in the Pennsylvania State Police Legislative Affairs Office. Wilhelm's lawsuit named as defendants the Commonwealth of Pennsylvania, the Pennsylvania State Police and individual Pennsylvania State Police employees not including Col. Miller. (Complaint ¶15.) Col. Miller as-

serts that the article is false since he has never been the subject of a sex or gender discrimination case and was never accused of such by Wilhelm. (Complaint ¶¶14, 15.) Furthermore, he claims the article is false since he did not, in fact, fire Wilhelm and she did not allege that in her lawsuit. (Complaint ¶18.) Finally, Col. Miller asserts the article is false since it portrayed him as the "president" of "an old boys club" within the Pennsylvania State Police, as someone who tolerates sexual misconduct, and as someone not to be taken at his word when he said he would institute a zero-tolerance policy. (Complaint ¶21.)

Plaintiff alleges that the defendants published the article with knowledge that it was false, or with reckless disregard of truth or falsity. (Complaint ¶¶31, 32.) With regard to reckless disregard, plaintiff alleges that the defendants failed to verify their facts with him or with the Pennsylvania State Police prior to publication and also failed to verify the facts against the Wilhelm lawsuit, a matter of public record. (Complaint ¶¶13, 16, 19.) Plaintiff seeks both compensatory and punitive damages for the alleged harm he has suffered to his professional and personal reputation and for his resultant severe emotional distress.

## LEGAL DISCUSSION

Defendants raise preliminary objections testing the legal sufficiency of plaintiff's defamation action. The question presented by the demurrer (legal insufficiency) is whether, on the facts averred, the law says with certainty that no recovery is possible. Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it. *Tucker v.*

*Philadelphia Daily News,* 577 Pa. 598, 848 A.2d 113, 131 (2004). (citations omitted)

An action for defamation under Pennsylvania statute requires as follows:

"*Section 8343. Burden of proof*

"(a) Burden of plaintiff.—In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

"(1) The defamatory character of the communication.

"(2) Its publication by the defendant.

"(3) Its application to the plaintiff.

"(4) The understanding by the recipient of its defamatory meaning.

"(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

"(6) Special harm resulting to the plaintiff from its publication.

"(7) Abuse of a conditionally privileged occasion." 42 Pa.C.S. §8343.

"If the statement in question bears on a matter of public concern, or the defendant is a member of the media, First Amendment concerns compel the plaintiff to prove, as an additional element, that the alleged defamatory statement is in fact false." *Lewis v. Philadelphia Newspapers Inc.,* 833 A.2d 185, 191 (Pa. Super. 2003). (citations omitted) Where the plaintiff is a public figure or public official, as is the plaintiff here, the plaintiff must additionally prove that the defendant, in publishing the offending statement, acted with actual malice, *i.e.,* "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *Id.* (cita-

tions omitted) See *Tucker,* 848 A.2d at 127-28 (to prevail on a defamation claim, the pubic figure plaintiff must prove, by clear and convincing evidence, that the allegedly defamatory statements were false and that the defendants published them with actual malice).

" 'Actual malice' is a fault standard, predicated on the need to protect the public discourse under the First Amendment from the chill that might be fostered by less vigilant limitations on defamation actions brought by public officials.

"[T]he stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies. Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones. . . .

"Thus, the actual malice standard, by design, assures 'that public debate will not suffer for lack of "imaginative expression" or "rhetorical hyperbole" which has traditionally added much to the discourse of this Nation.' . . . '[T]he First Amendment requires that we protect some falsehood in order to protect speech that matters.' " *Lewis* at 191. (citations omitted)

The defendants attack plaintiff's complaint as insufficient since they claim the alleged defamatory statements are not false. Alternatively, they argue that the plaintiff has failed to sufficiently plead actual malice.

44

First, defendants assert that the defamation action is legally insufficient since the portions of the article that are allegedly defamatory are either substantially true or are mere opinion. Defendants accurately characterize the essence of plaintiff's defamation claims to consist of the following: (1) defendants falsely claimed plaintiff was the subject of a sex or gender discrimination suit; (2) defendants falsely claimed he fired Ms. Wilhelm; and (3) defendants falsely claimed he was the "president" of "an old boys club" within the Pennsylvania State Police, was someone who tolerates sexual misconduct, and was someone who cannot be taken at his word when he said he would institute a zero-tolerance policy. (Complaint ¶¶14, 18, 21.) Defendants argue that the first two statements are substantially true and the third is opinion.

Not every error in a publication provides a basis for a defamation action. Pennsylvania law provides that it is a complete defense to a libel action that the publication is "substantially true." 42 Pa.C.S. §8342. "Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.' Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.' " *Mason v. New Yorker Magazine Inc.,* 501 U.S. 496, 517 (1991). (citations omitted)

In this case, the pleaded truth would reveal that the statements that plaintiff "was the subject of a sex discrimination suit" in which Ms. Wilhelm won $277,000 "disputing her firing by Miller," are substantially true. The pleaded truth, discerned from the complaint, attached exhibits and the public record of the underlying suit

against the Pennsylvania State Police, reveals as follows:[1] Following trial in federal court in September 2002, a jury found that Wilhelm had been dismissed from her job as a legislative specialist with the Legislative Affairs Office of the Pennsylvania State Police because she had complained about sex discrimination. The jury awarded her $250,000 damages. The final judgment was later increased to reflect delay damages, attorney's fees and costs.

The essence of her federal suit was that over the course of her employment in the Legislative Affairs Office, from January 1998 through her termination on May 1, 2000, she was discriminated on the basis of her gender as reflected in her salary, the manner in which she was treated and in her opportunities for advancement; that she complained repeatedly, to no avail, to her supervisors, and elsewhere, about her disparate treatment; and that in retaliation, she was fired. Officially, Wilhelm had been told her job was terminated due to the need to reorganize the Legislative Affairs Office. Her complaint included separate counts for equal pay, sex discrimination and wrongful discharge. In addition to naming the Commonwealth of Pennsylvania and the Pennsylvania State Police as defendants, Wilhelm also named three individual defendants, then-Commissioner of the Pennsylvania State Police Paul J. Evanko, the Deputy Commissioner of

---

1. The documents from the Wilhelm case—including the federal complaint, orders of judgment and portions of Colonel Miller's and Wilhelm's trial testimony—were not part of the pleadings, but were attached to defendants' brief. Nevertheless, "a court may take judicial notice of public documents in ruling on a preliminary objection in the nature of a demurrer." *Solomon v. United States Healthcare Systems of Pennsylvania Inc.,* 797 A.2d 346, 352 (Pa. Super. 2002). (citation omitted)

Administration, Lt. Col. Thomas Coury, and her imme-
diate supervisor in the Legislative Affairs Office, Cap-
tain Michael Simmers.[2] (Defendants' supporting brief,
exhibit C.)

By the time of trial, Wilhelm's equal pay and discrimi-
nation counts had been dismissed leaving her wrongful
discharge claim remaining. As to that claim, Wilhelm
brought it against all the named defendants, asserting
they had initiated a series of investigations and adminis-
trative actions to destroy her career in retaliation for her
making complaints about their discriminatory employ-
ment practices, obtaining private legal counsel and dis-
cussing her complaints with an independent entity within
the state government. *Id.*

Plaintiff points out that the editorial's depiction of
Wilhelm's lawsuit was false since Wilhelm never accused

---

2. Among Wilhelm's complaints were that she was not assigned an
automobile, was held accountable for leave usage and attendance, was
required to perform duties outside of her classification and was pro-
hibited from attending staff meetings and selected legislative func-
tions; that she repeatedly notified Comm. Evanko and those under his
supervision, as well as a number of people under the supervision of
Lt. Col. Coury of the disparate treatment; that persons within the de-
partment learned of her complaints in violation of department proce-
dure; that Comm. Evanko and Lt. Col. Coury allowed Simmers to
head an investigation of her complaints even though she was making
complaints against him; that her complaints against Captain Simmers
were adjudicated and held to be unfounded without notifying her or
permitting her to be a witness to the proceedings, in violation of inter-
nal regulations; that she was not afforded an opportunity to apply for
the director of the Legislative Affairs Office, which position was given
to then-Captain Jeffrey Miller by Comm. Evanko on March 18, 2000,
and that Wilhelm was required to train Miller after he was chosen; that
she was not given an opportunity to apply for the assistant legislative
liaison position, which was given to another male employee, and that
she was also required to train him.

Col. Miller of discriminating against her or firing her. This is technically accurate; however, the public record indicates the editorial's depictions of Col. Miller's role are substantially true. Colonel Miller testified at Wilhelm's trial on behalf of the defendants in that suit. The trial record indicates that Colonel Miller began work in the Legislative Affairs Office on February 24, 2000, and he was assigned by Comm. Evanko to be the director on March 18, 2000. Commissioner Evanko told Colonel Miller he wanted to professionalize the office, fix communications problems and have office personnel working in the same direction. After reviewing staffing issues, Col. Miller reported back that he needed clerical support. He also recounted that Wilhelm did not appear to be on board with his goals and that in April 2000 she had responded viscerally to his direction for open office communications, particularly involving another employee. As a result, Col. Miller approached Comm. Evanko and Lt. Col. Coury on April 17, 2000, while at a training course. He told Comm. Evanko that he needed clerical help more than the legislative specialist position, then filled by Wilhelm. (Defendants' supporting brief, exhibit D (pp. 10, 17-18, 32-34).) He testified that:

"I requested that if there was any way possible for us to get clerical support in the office, that we needed that as soon as possible. And secondly my recommendation was that Ms. Wilhelm be removed from my office as soon as possible if the commissioner saw fit to do so." (*Id.* at p. 34.)

According to Col. Miller, Comm. Evanko told him he understood Col. Miller and would discuss it with Lt. Col. Coury. Colonel Miller learned a short while later from Lt. Col. Coury that action had been taken upon his re-

quest to remove Wilhelm from his office. Colonel Miller was directed to take Wilhelm to a meeting with the personnel director the next business day, whereupon she would be fired. Indeed, on May 1, 2000, he accompanied her to the personnel department where she was provided a copy of a letter outlining her dismissal, effective that day. (*Id.* at pp. 35-37.)

In reaching its verdict, the jury specifically found that Wilhelm "was dismissed from her job because she complained about sex discrimination." (*Id.* exhibit C.) This verdict was clearly a rejection of the official reason for firing Wilhelm, and as testified to by Col. Miller, which was that the police needed to reorganize the Legislative Affairs Office. Thus, the reasons offered by Col. Miller for firing her were found by the jury to have been pretextual. The jury found Wilhelm had been fired in retaliation for raising sex discrimination complaints. Thus, the depiction in the editorial that Col. Miller had fired Wilhelm is substantially true. Colonel Miller initiated and succeeded in getting her fired by requesting that Comm. Evanko remove her from his office. Furthermore, it is accurate that Col. Miller's actions were the subject of Wilhelm's sex discrimination case. By the time of trial, the only issue before the jury was whether Wilhelm had been wrongfully terminated. Her termination was set in motion by Col. Miller. Thus, a fair reading of the editorial's depiction of the Wilhelm lawsuit and Col. Miller's relationship and involvement in it, would have the same effect on the mind of the reader as that produced from the pleaded truth as reflected in the record from the Wilhelm trial. *Mason, supra.* As such, because the challenged language is substantially true, plaintiff's claims are legally insufficient to maintain a defamation action.

Next, the defendants argue that Col. Miller cannot maintain his defamation action based upon language suggesting Col. Miller was the president of an "old boys club," since the language is opinion. I agree. The portion of the article in question states:

"[Wilhelm] claimed the office had turned into an old boys club.

"If this is true, can the president of that club really be expected to conduct a thorough 'zero tolerance' probe?"

Colonel Miller characterizes this portion of the article as falsely stating that he was the president of an "old boys club" within the Pennsylvania State Police, was someone who tolerates sexual misconduct, and was someone who cannot be taken at his word when he said he would institute a zero-tolerance policy. This is a mischaracterization of the plain words of the article. The language posits a question and an opinion that "if this is true," as Wilhelm suggests, that the Pennsylvania State Police had become an "old boys club," then Col. Miller, as the head of the police or "president of that club," should not preside over the probe into police misconduct. The article does not state that Col. Miller is the president of an old boys club. Nor does it state that he cannot be expected to properly conduct the probe.

Under Pennsylvania law, "[o]pinion, without more, is not actionable as libel." *Beckman v. Dunn,* 276 Pa. Super. 527, 535, 419 A.2d 583, 587 (1980). Similarly, under federal law, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). To be ac-

tionable, an opinion "may reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." *Beckman, supra.* The basis for the opinion that Col. Miller should not conduct the probe because the Pennsylvania State Police might have become an old boys club was disclosed in the editorial; that is, numerous substantiated cases of sexual misconduct existed within the state police ranks, including the Wilhelm case, a case in which Col. Miller actively sought to terminate her position and resulting in her winning a substantial verdict against the police. As such, this language is protected speech.

Second, the defendants alternatively seek dismissal of Col. Miller's action on the basis that the pleadings are legally insufficient to meet the actual malice standard required to maintain defamation against a public figure. As noted, actual malice requires that statements be published with knowledge of their falsity or with reckless disregard of whether they are false or not. See *Tucker, supra,* 848 A.2d at 127-28. The requirement that the plaintiff be able to show actual malice by clear and convincing evidence is initially a matter of law. *Id.,* 848 A.2d at 130 (citing *Milkovich* at 17).

"This rule [requiring actual malice] is not simply premised on common-law tradition, but on the unique character of the interest protected by the actual malice standard. Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of breathing space so that protected speech is not discouraged. The meaning of terms such as actual malice—and, more particularly, reckless disregard—however, is not readily

captured in one infallible definition. Rather, only through the course of case-by-case adjudication can we give content to these otherwise elusive constitutional standards. Moreover, such elucidation is particularly important in the area of free speech for precisely the same reason that the actual malice standard is itself necessary. Uncertainty as to the scope of the constitutional protection can only dissuade protected speech—the more elusive the standard, the less protection it affords. Most fundamentally, the rule is premised on the recognition that *'[j]udges, as expositors of the constitution,' have a duty to 'independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice." ' " Tucker,* 848 A.2d at 130-31 (quoting *Harte-Hanks Communications Inc. v. Connaughton,* 491 U.S. 657, 685-86, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (emphasis added in *Tucker*)).

As explained above, the speech in question was either substantially true or was opinion. As such, actual malice cannot be shown since the article was not published with either knowledge of falsity or reckless disregard for its potential falsity.

Furthermore, to the extent that the editorial could be considered false, the plaintiff has failed to sufficiently allege actual malice since his allegations of reckless disregard amount to no more than negligence. Regarding the showing of actual malice through reckless disregard, our Supreme Court in *Tucker* stated:

"It is clear that a showing of '[a] "reckless disregard" for the truth . . . requires more than a departure from reasonably prudent conduct.' *Harte-Hanks,* 491 U.S. at

688, 109 S.Ct. 2678. Failure to check sources, or negligence alone, is simply insufficient to maintain a cause of action for defamation. Recklessness generally, and in the context of actual malice, is not easily shown. As we have explained:

"The [United States] Supreme Court has emphasized that the question of whether a statement has been published with reckless disregard of falsity is not measured by whether a reasonably prudent man would have [published], or would have investigated before publishing. Rather, (t)here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Thus, while recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports it simply cannot be concluded that a defendant entertained the requisite doubt as to the veracity of the challenged publication where the publication was based on information a defendant could reasonably believe to be accurate.

"*Curran,* 439 A.2d at 660 (internal citations and quotations omitted). The allegations of recklessness against appellant-newspapers, at best, present a situation in which one could conclude that perhaps it would have been better if appellant-newspapers asked the Tuckers or their attorney directly whether their loss of consortium claim included a claim for damage to their sexual relationship. However, while hindsight may be twenty-twenty, this failure does not constitute actual malice. Indeed, it may not rise to the level of negligence." *Tucker,* 848 A.2d at 135-36.

Colonel Miller here raises the almost identical bases as argued in *Tucker* for claiming reckless disregard by

the newspapers; that is, Col. Miller asserts that the defendants avoided the truth by failing to check with him or the Pennsylvania State Police to verify their facts, and by failing to verify their facts against the public record. (Complaint ¶¶13, 16 and 23.) These allegations are legally insufficient to assert actual malice since they amount to no more than negligence, carelessness, bad judgment or inaccuracy in the preparation and publication of the editorial in question. *Tucker, supra.* As such, to the extent the publication could be considered false, plaintiff has failed to sufficiently assert actual malice on the basis that the defendants published with reckless disregard for whether the article was true or false.[3]

Accordingly, we enter the following:

## ORDER

And now, January 28, 2005, defendants' preliminary objections to plaintiff's complaint are sustained. Plaintiff's complaint is hereby dismissed.

---

3. To the extent that plaintiff alleges actual malice on the basis that the defendants published the editorial with knowledge of its falsity, his allegations would be sufficient to withstand a demurrer, assuming the publication was indeed false. See complaint ¶23 (plaintiff alleges "defendants knew that the statements, innuendoes and implications concerning Colonel Miller in the . . . editorial were totally false."). As noted, however, the statements at issue are substantially true or are opinion.