**In re Neal M. JACOBS, Debtor.**

**George P. Viener, Plaintiff,**

v.

**Neal M. Jacobs, Defendant.**

**Bankruptcy No. 01–24739ELF.**
**Adversary No. 02–02023ELF.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 24, 2008.

See also 381 B.R. 147, 2008 WL 199898.

George J. Shoop, Barley Snyder, Reading, PA, Rees Andrew Griffiths, Barley Snyder LLC, York, PA, for Plaintiff.

Charles J. Phillips, Eden R. Bucher, Leisawitz Heller Abramowitch Phillips, Wyomissing, PA, Paul P. Padien, Fox Rothschild LLP, Exton, PA, for Defendant.

### MEMORANDUM OPINION

ERIC L. FRANK, Bankruptcy Judge.

### I. INTRODUCTION

This adversary proceeding involves a Pennsylvania state court judgment en-

tered nearly seven (7) years ago in favor of George P. Viener ("Viener") against Neal M. Jacobs ("the Debtor"). The judgment is in the amount of approximately $1.2 million in compensatory damages and $1 million in punitive damages. The judgment was based on the state court's determination that the Debtor breached his fiduciary duty to Viener, a minority shareholder in certain corporations in which the Debtor also had an interest.[1] The state court found the Debtor guilty of "oppressive" and "outrageous" conduct in his capacity as a majority shareholder of the corporations, as well as "fraud" and "self-dealing." [2]

In October 2001, after the entry of the state court judgment, the Debtor filed this chapter 7 bankruptcy case. In this adversary proceeding ("the § 523 AP"), Viener requests a determination that the debt owed by the Debtor is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6). Presently before the court is Viener's Motion for Summary Judgment ("the Motion").

As explained below, I conclude that the findings of the state court have preclusive effect in the § 523 AP. Based on those findings, Viener has proven all of the elements necessary to obtain a determination under 11 U.S.C. § 523(a)(6) that debt is nondischargeable. Therefore, I will grant the Motion.[3]

### II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

■ The § 523 AP emanates from a dispute among business partners that led

---

1. *See Viener v. Jacobs*, 51 Pa. D. & C.4th 260 (C.P. Berks 2000) ("*Jacobs I*") and *Viener v. Jacobs*, 52 Pa. D. & C.4th 353 (C.P. Berks 2001) ("*Jacobs II*"). *Jacobs I* was affirmed in part and reversed in part and *Jacobs II* was affirmed in *Viener v. Jacobs*, 834 A.2d 546 (Pa.Super.2003) ("*Jacobs III*").

2. *Jacobs I*, 51 Pa. D. & C.4th at 282, 295–96.

3. Because summary judgment will be granted on Viener's § 523(a)(6) claim, it is unnecessary to decide whether the debt also is nondischargeable under § 523(a)(4).

to extensive state litigation ("the Viener Litigation"), culminating in the entry of the state court judgment mentioned above of approximately $1.2 million in compensatory damages and $1 million in punitive damages. The facts and procedural history of the Viener Litigation are rather elaborate. The details are available to the interested reader in several opinions the state trial and appellate courts have issued.[4] Therefore, I will not further encumber the record with a full recitation, but will limit myself to the brief summary needed to understand the issues the Motion raises.

## A. Factual Background

Over twenty years ago, the Debtor, along with two other business associates, George Viener ("Viener") and Norman Rush ("Rush"), formed a textile manufacturing company called "NGN"—NGN standing for Neal, George and Norman.[5] Viener, Rush and the Debtor were officers and employees of NGN. At all relevant times, Viener, Rush and the Debtor each owned one-third (1/3) of NGN's outstanding stock.

Also involved in the factual matrix of this proceeding are three other entities.

First is Reading Garment Company ("RGC"). Viener, Rush, the Debtor and a fourth individual, Allen Friedman ("Friedman"), each owned one-quarter (1/4) of

RGS's outstanding stock. RGC also was in the textile manufacturing industry and operated in harmony with NGN.[6]

Second is NV Sportwear, Inc. ("NV Sportswear"), one of NGN's largest subcontractors. The majority shareholder of NV Sportswear is an individual named Kim Van Vu ("Ms. Van Vu"). Third is a company called "Kimmex." Like NGN and RGC, Kimmex was in the textile manufacturing business.[7]

In 1994, Viener expressed concerns about NGN's management and operation.[8] Soon thereafter, the Debtor and Rush voted to remove Viener as president of NGN and demoted him to vice-president, though his salary remained the same. Michael A. Joffred ("Joffred") replaced Viener as NGN's president. In January 1995, the Debtor and Rush advised Viener by letter that NGN's Board of Directors had terminated Viener's employment. Viener remained on NGN's Board of Directors after being fired. Ultimately, neither NGN nor RGC survived as profitable entities. NGN and RGC ceased business operations in August 1997.

## B. The Initial State Court Proceedings

In February 1995, Viener initiated the Viener Litigation against the Debtor, Rush, Joffred, Allen Friedman and several business entities by filing a complaint in

---

4. *See* n. 1, *supra.* A bankruptcy court may take judicial notice of the matters of record in the state courts within its jurisdiction. *E.g., In re Soto,* 221 B.R. 343, 347 (Bankr.E.D.Pa. 1998).

5. The information set forth in Part II.A. are facts that are undisputed by the parties.

6. The Trial Court stated, "NGN purchased fabric and marketed the men's apparel line and RGC marketed the ladies' apparel line." *Jacobs I,* 51 D & C.4th at 288.

7. In *Jacobs II,* the state trial court found that Ms. Van Vu and the Debtor were "partners" in Kimmex. *See Jacobs II,* 52 Pa. D. & C.4th at 360 (Findings of Fact Nos. 36–38).

8. Viener's concerns centered on: (1) cash payments the Debtor authorized to NV Sportwear and to NV Sportswear's majority shareholder, Ms. Van Vu, and (2) the acquisition and location of certain machinery and equipment.

the Trial Court.[9] The complaint alleged, *inter alia:* that Viener's former business partners conspired to discharge him wrongfully from his position as President of NGN and from his employment with RGC; that the Debtor, Rush and Friedman breached their fiduciary duty to Viener as a minority shareholder; and that the Debtor, Rush and Friedman engaged in a civil conspiracy to deprive Viener's rights as a minority shareholder. In May 1995, Viener filed a Second Amended Complaint that alleged that the Debtor usurped and appropriated a corporate opportunity of NGN by purchasing a sewing facility in Mexico with Ms. Van Vu to produce garments for NGN that would be accounted separately from other NGN sales. *Jacobs III*, 834 A.2d at 551. For various reasons not material to the Motion, by the time the Viener Litigation was ready for trial, Viener's only remaining claims were those alleged against the Debtor.

The parties agreed to a bifurcated non-jury trial in the Viener Litigation. After the trial on liability, the Trial Court entered a Decree *Nisi* in Viener's favor on June 30, 2000 and determined that the Debtor was liable for both compensatory and punitive damages. The Trial Court made detailed Findings of Fact and Conclusions of Law. The court found that the Debtor: (1) in concert with other shareholders acted as a majority shareholder in NGN and RGC, (2) owed a fiduciary duty to Viener, the minority shareholder and (3) breached that fiduciary duty. *Jacobs I*, at 281–296.[10] In short, the court found that the Debtor "squeezed Viener out of NGN

and RGC" and "left him with an interest in a corporate shell." *Jacobs I*, 51 D. & C.4th at 295. The court found that this was accomplished by "fraud, self-dealing, self-interest and misconduct by [the Debtor]." *Id.* at 282.

The damage phase of the trial was held on September 7, 8, 12, 20 and 28, 2000 and the court reopened the record for rebuttal in April 2001. On April 24, 2001, the Trial Court entered an award in favor of Viener in the amount of $1.2 million dollars in compensatory damages and $1 million dollars in punitive damages.

The Debtor filed Post–Trial Motions, which were denied by the Trial Court. On July 12, 2001, the judgment was entered. The Debtor appealed the judgment to the Pennsylvania Superior Court.

## C. The Bankruptcy Proceedings and the Later State Court Proceedings

On October 11, 2001, after the Debtor filed his notice of appeal in the Viener Litigation but before the Trial Court filed its Pa. R.A.P.1925(a) Opinion in the Viener Litigation, the Debtor filed his chapter 7 bankruptcy petition. The commencement of the bankruptcy case stayed the state court appeal. The Trial Court, nevertheless, filed the Pa.R.A.P.1925(a) Opinion on October 25, 2001, addressing the Debtor's appellate issues. Thereafter, the automatic stay was lifted, and the appeal was reinstated.

On January 28, 2002, Viener initiated the § 523 AP, by filing a complaint re-

---

9. The Complaint also named as defendants NGN and its following affiliates: RGC, Ellmar Manufacturing Inc., Nagan Leasing Inc., Energy Knits, Inc., Reading Dyeing and Finishing Inc., Little Creek Mills Inc., LCMA Inc., Amity Finishing Inc. and G.N.K. Partnership.

10. In its opinion affirming the Trial Court decision on liability, the Pennsylvania Superior Court described the finding as follows: "the trial court concluded that Jacobs, as majority shareholder, owed a fiduciary duty to Viener, as minority shareholder, and that Jacobs' conduct in 'freezing out' Viener was outrageous and oppressive." *Jacobs III*, 834 A.2d at 553.

questing a determination that his claim against the Debtor was nondischargeable pursuant to 11 U.S.C. § 523(a) ("the § 523 AP"). On March 26, 2002, the Trustee filed a separate adversary proceeding, docketed as Adv. No. 02–2087, objecting to the Debtor's discharge ("the § 727 AP"). The Complaint in the § 727 AP alleges that the Debtor should be denied a discharge under 11 U.S.C. §§ 727(a)(2)(A), (a)(3) and (5).

On April 18, 2002, after the Debtor filed his Answer to the Complaint in the § 523 AP, the court entered an order approving a Stipulation staying all further proceedings in the § 523 AP pending the entry of a final, non-appealable order in the state court proceedings. *See* Docket Entry No. 7.[11]

On September 3, 2003, the Superior Court affirmed in part and reversed in part the orders of the Trial Court, and remanded the Viener Litigation to the Trial Court. *See Jacobs III.* The Debtor sought further review by the Pennsylvania Supreme Court, which was denied on August 16, 2004. *See Viener v. Jacobs,* 579 Pa. 704, 857 A.2d 680 (2004). The U.S. Supreme Court denied certiorari on February 22, 2005. *See Jacobs v. Viener,* 543 U.S. 1146, 125 S.Ct. 1300, 161 L.Ed.2d 107 (2005).

On March 22, 2006, the Debtor's counsel filed a status letter with this court stating that, on October 12, 2005, following the Superior Court remand in the Viener Litigation, the Trial Court had carried out its

mandate and recalculated the damages awarded Viener.[12] *See* Adv. No. 02–2023 (Docket Entry No. 28). The March 22, 2006 letter also advised the court that the Debtor's post-trial motions objecting to the damages recalculation were denied on February 10, 2006. *Id.* However, the Debtor's counsel indicated that she and the Trustee's counsel believed that the adversary proceedings should remain stayed because, on March 7, 2006, the Debtor had filed a timely appeal from the Trial Court's February 10, 2006 Order denying the Debtor's post-trial motions from that Order on March 7, 2006. *Id.*

I held a status hearing on November 11, 2006[13] in both adversary proceedings. At that time, the parties agreed that it was no longer advisable to stay the adversary proceedings while awaiting the outcome of further litigation in the Viener Litigation. Rather, the parties requested the opportunity to determine whether the two (2) adversary proceedings were most appropriately resolved by way of summary judgment. Consequently, I entered a Pre–Trial Order on November 8, 2006 establishing deadlines for the filing of motions for summary judgment and responses thereto. *See* Adv. No. 02–2087 (Docket Entry No. 36); Adv. No. 02–2023 (Docket Entry No. 7).

In the § 523 AP, Viener filed the Motion on January 8, 2007. After all of the written submissions were filed, I held argument on the Motion (along with a corresponding motion for summary judgment in

---

11. Subsequently, on October 28, 2002, a similar order was entered in the § 727 AP on October 28, 2002. *See* Adv. No. 02–2087 (Docket Entry No. 8).

12. For present purposes, the amount of the modification was modest and immaterial.

13. Prior to his retirement on February 14, 2006, the Hon. Thomas M. Twardowski pre-

sided over the Debtor's main bankruptcy case, the § 727 AP and the § 523 AP. Upon Judge Twardowski's retirement, the bankruptcy case and the adversary proceedings were assigned to his successor, Judge Richard E. Fehling. On July 12, 2006, Judge Fehling entered an order recusing himself and all of the bankruptcy matters were reassigned to me. *See* Adv. No. 02–2023 (Docket Entry No. 26).

the § 727 AP) on June 13, 2007 and afterwards, took the matter under advisement.[14]

## III. *THE LEGAL STANDARD FOR SUMMARY JUDGMENT*

Pursuant to Rule 56(c), summary judgment should be granted when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The standard for evaluating a motion for summary judgment under Fed.R.Civ.P. 56 is well established and has been stated in numerous written opinions in this district. *E.g., In re Klayman*, 333 B.R. 695 (Bankr.E.D.Pa.2005); *In re Lacheen*, 2005 WL 1155257 (Bankr.E.D.Pa. Apr. 28, 2005) (per Sigmund, Ch. J.); *In re Lewis*, 290 B.R. 541 (Bankr.E.D.Pa.2003) (per Carey, J.); *In re Newman*, 304 B.R. 188 (Bankr.E.D.Pa.2002) (per Fox, Ch. J.).

Before a motion for summary judgment may be granted, the court must find that the motion alleges facts which, if proven at trial, would require a directed verdict in favor of the movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). If the movant meets this initial burden, the responding party may not rest on his or her pleadings, but must designate specific factual averments through the use of affidavits or other permissible evidentiary material that demonstrate a triable factual dispute.[15] *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Such evidence must be sufficient to support a jury's factual determination in favor of the nonmoving party. *Id.* Evidence that merely raises some metaphysical doubt regarding the validity of a material facts is insufficient. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If the party opposing the motion believes that summary judgment is premature, Rule 56(f) requires the party to present by affidavit the reasons why the party is presently unable to submit evidence in opposition to the motion. *Celotex*, 477 U.S. at 326, 106 S.Ct. at 2554.

In considering the evidentiary matter submitted in support and in opposition to a summary judgment motion, the court's role is not to weigh the evidence, but only to determine whether there is a disputed, material fact for determination at trial. *Anderson*, 477 U.S. at 247–50, 106 S.Ct. at

---

**14.** Coincidentally, the Superior Court rendered a decision affirming the Trial Court's order recalculating damages after the initial remand on June 12, 2007, the day before argument on the Motion. See Jacobs IV. As for the Trustee's motion for summary judgment in the § 727 AP, by separate Memorandum Opinion and Order of this date, I have denied the Trustee's motion because there are disputed issues of material fact in that proceeding.

**15.** The parties' respective burdens of proof also play a role in determining the merits of a summary judgment motion:

[W]here the movant is the defendant, or the party without the burden of proof on the underlying claim, the movant still has the initial burden of showing the court the absence of a genuine issue of material fact, but ... this does not require the movant to support the motion with affidavits or other materials that negated the opponent's claim. In contrast, where ... "the party moving for summary judgment is the plaintiff, or the party who bears the burden of proof at trial, the standard is more stringent." *National State Bank v. Federal Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992).

*In re Newman*, 304 B.R. at 193 (*quoting Adams v. Consolidated Rail Corp.*, 1994 WL 383633, *1–*2 (E.D.Pa. July 22, 1994)).

2510–11. A dispute about a "material" fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248, 106 S.Ct. at 2510. All reasonable inferences must be drawn in favor of the nonmoving party and against the movant. *United States v. 717 South Woodward Street,* 2 F.3d 529, 533 (3d Cir.1993).

## IV. *VIENER IS ENTITLED TO SUMMARY JUDGMENT UNDER § 523(a)(6)*

In support of the Motion, Viener submitted no evidentiary material (other than copies of the state court opinions). He contends that all of the material facts necessary to for him to succeed in his claim under 11 U.S.C. § 523(a)(6) were determined in his favor by the Trial Court and are binding on the Debtor in this proceeding under the doctrine of collateral estoppel.

My analysis of the merits of the Motion requires four (4) steps. First, I will set out the legal standard that must be satisfied for a dischargeability determination under 11 U.S.C. § 523(a)(6). Second, I will summarize the Trial Court's findings that are pertinent to the § 523(a)(6) claim in this court. Third, I will describe the legal standard for the application of collateral estoppel and determine whether the doctrine applies in this proceeding. Finally, if collateral estoppel applies, I will decide whether the applicable facts support the entry of judgment in Viener's favor as a matter of law under § 523(a)(6).

### A. The Requirements Under 11 U.S.C. § 523(a)(6) for Determining A Debt Nondischargeable

 Section 523(a)(6) of the Bankruptcy Code provides that a chapter 7

discharge does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Based upon the overriding purpose of the Bankruptcy Code of providing relief to debtors from the weight of oppressive indebtedness and provide them with a fresh start, exceptions to discharge are strictly construed against creditors and liberally construed in favor of debtors. *E.g., In re Cohn,* 54 F.3d 1108, 1113 (3d Cir.1995) As with other § 523(a) exceptions to discharge, the creditor bears the burden of demonstrating nondischargeability by a preponderance of the evidence. *See, e.g., Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Graham,* 973 F.2d 1089, 1101 (3d Cir. 1992).

 The key phrase in § 523(a)(6) is "willful and malicious injury." Generally speaking, the willfulness requirement refers to conduct that is "deliberate" or "intentional." 4 *Collier on Bankruptcy* ¶ 523.12[2], at 523–92.4 (15th rev. ed.2007) ("Collier").[16] The "malice" requirement refers to injuries that are "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." *Id.* (footnote omitted). The two concepts are said to be "distinct requirements." *Id.* ¶ 523.12[2], at 92.3.

Case law analyzing the "willful and malicious" requirement under § 523(a)(6) is divided into two initial lines, differentiated by the nature of the debtor's state of mind in taking the action that caused injury to the creditor.

In a minority of cases, courts have required that the debtor act with the specific intent or purpose of causing injury to the

---

**16.** In the interest of full disclosure, I note that I am a Contributing Author to *Collier on Bankruptcy,* with responsibility for chapter

523. Final editorial control of the content of the treatise rests with an editorial board. I am not a member of the editorial board.

creditor before finding the debt arising from the conduct to be nondischargeable under § 523(a)(6). *See, e.g., Matter of Hartley,* 869 F.2d 394 (8th Cir.1989); *In re Akridge,* 89 B.R. 66 (9th Cir. BAP 1988).

In the overwhelming majority of cases, courts have taken a broader view, holding that the "willful and malicious" nature of the injury caused by a debtor's conduct may be inferred from the nature of the act itself. *See* Shawn M. Blatt, *Willful and Malicious Exception From Discharge: the "Implied Malice" Standard,* 16 U. Dayton L.Rev. 155, 163–164 & n. 85 (1990) (collecting cases). In the majority view, malice can be inferred from deliberate conduct that "necessarily produces harm or which has a substantial certainty of causing harm and is without just cause or excuse." 4 Collier ¶ 523.12[2], at 523–92.4 (quoted in *Printy v. Dean Witter Reynolds, Inc.,* 110 F.3d 853, 859 (1st Cir.1997)) (collecting cases). The roots of this "implied malice" doctrine are found in *Tinker v. Colwell,* 193 U.S. 473, 487, 24 S.Ct. 505, 509, 48 L.Ed. 754 (1904), where the Supreme Court, in interpreting § 523(a)(6)'s predecessor provision in the former Bankruptcy Act,[17] stated that an act that "necessarily causes injury and is done intentionally, may be said to be done willfully and maliciously, so as to come within the [bankruptcy discharge] exception."

■ Prior to 1998, the "implied malice" line of cases was itself splintered into two (2) sub groups, as courts were divided on the question whether a debtor's "reckless" conduct satisfies the "willful and malicious standard." That question was answered in the negative by Supreme Court in *Ka-*

*waauhau v. Geiger,* 523 U.S. 57, 61–62, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998).

Other questions were left unanswered by *Geiger.* After *Geiger* was decided in 1998, courts that continue to apply the "implied malice" doctrine have debated whether an objective test or a subjective test should apply when determining there is a substantial certainty of harm to the creditor as a result of a debtor's conduct:

> Under the subjective approach, an injury is willful and malicious for purposes of § 523(a)(6) only if the debtor subjectively intended to cause injury or subjectively believed that injury was a substantially certain consequence of his or her deliberate action.
>
> Under the so-called objective approach, an injury is willful for purposes of § 523(a)(6) only if the debtor subjectively intended to cause injury or there was an objective substantial certainty of injury as a consequence of his or her deliberate action. Emphasis is placed under this approach on the assessment of the finder of fact of the likelihood of injury instead of the debtor's knowledge or belief.

*In re Conner,* 302 B.R. 509, 514 (Bankr. W.D.Pa.2003) (citations omitted).

■ The leading appellate decision in this Circuit is *In re Conte,* 33 F.3d 303 (3d Cir.1994). In *Conte,* our Court of Appeals endorsed an "implied malice" standard under § 523(a)(6), to be applied through what appears to be an objective test. *See id.* at 305: injury is willful and malicious under § 523(a)(6) "only if the actor purposefully inflicted the injury or acted with substantial certainty that injury would result."[18]

---

17. Section 17a. of the Bankruptcy Act excepted from discharge, *inter alia,* debts "for willful and malicious injuries to the person or property of another." 11 U.S.C. § 35 (repealed 1978).

18. Some language in *Geiger* arguably suggests that § 523(a)(6) applies only to a debtor who acted with the specific purpose of harming the creditor. Even though *Conte* was decided four (4) years before *Geiger,* many courts in this Circuit have continued to apply the *Conte*

■ However, if applied woodenly, the *Conte* formulation of the § 523(a)(6) standard can be overbroad. For example, a debt arising from a deliberate decision (perhaps out of economic necessity) to breach a commercial contract, arguably falls within the *Conte* test because it arises from intentional and wrongful conduct that has an objective likelihood of producing injury to the other party to the contract. Yet, § 523(a)(6) is not intended to render nondischargeable debts arising from simple breaches of contract. *In re Riso,* 978 F.2d 1151 (9th Cir.1992); *In re Williams,* 362 B.R. 838, 840–841 (Bankr.N.D.Ohio 2006). A limiting principle is sorely needed.

The most obvious limiting principle would be the requirement that the creditor's injury be caused by "tortious" conduct, not by breach of contract. *See Riso,* 978 F.2d at 1154 (citing cases); *accord, In re Jercich,* 238 F.3d 1202, 1205 (9th Cir. 2001) (where an intentional breach of contract is accompanied by tortious conduct which results in willful and malicious injury, the resulting debt is excepted from discharge under § 523(a)(6)). Such a limitation is consistent with the Supreme Court's statement in *Geiger* that the text of § 523(a)(6) "triggers in the lawyer's mind the category 'intentional torts.'" *Geiger,* 523 U.S. at 61, 118 S.Ct. at 977.

■ For purposes of analyzing the boundaries of § 523(a)(6), I also find it helpful to return to the basic proposition that the statutory term "willful and malicious" consists of two separate elements. To be "willful," the debtor's actions must have been voluntary and deliberate. To be "malicious," the debtor's actions either must have been taken with the specific goal of causing harm to the creditor or must have been substantially certain to have caused harm.[19] However, the concept of "malice" has another dimension— that the debtor's conduct be wrongful and without just cause or excuse, even in the

"implied malice" test. *See, e.g. In re Elwood,* 319 B.R. 371, 373 (E.D.Pa.2005); *In re Giarratano,* 358 B.R. 106 (D.Del.2004); *In re Pavlovskiy,* 2007 WL 2048965, *1 (Bankr.D.N.J. July 11, 2007) (per Ferguson, J.) (unpublished); *In re Cappozzolli,* 2007 WL 1170622, *3 (Bankr.D.N.J. Apr.16, 2007) (per Kaplan, J.) (not for publication); *In re Granoff,* 2006 WL 1997408, *10–11 (Bankr.E.D.Pa. June 6, 2006) (per Fox, J.), *affd,* 2006 WL 2583589 (E.D.Pa. Sept. 6, 2006), affd, 2007 WL 2980190 (3d Cir. Oct. 9, 2007) (non-precedential); *In re Andrews,* 2006 WL 4452986, *3 (Bankr.D.N.J. May 10, 2006) (per Burns, J.) (not for publication); *In re Reath,* 368 B.R. 415, 426 (Bankr.D.N.J.2006) (per Wizmur, J.); *In re Ali,* 321 B.R. 685, 693–694 (Bankr. W.D.Pa.2005) (per McCullough, J.); *In re Scott,* 294 B.R. 620, 632 (Bankr.W.D.Pa.2003) (per Markovitz, J.); *In re Hawkins,* 2001 WL 1820324, *3 (Bankr.D.Del. Mar. 1, 2001) (per Walrath, J.); *In re Hartman,* 254 B.R. 669, 675 (Bankr.E.D.Pa.2000) (per Twardowski, J.).

I agree with those courts that have concluded that *Conte* retains its vitality post-*Geiger.*

*Geiger* held only that reckless behavior is not "willful and malicious" under § 523(a)(6). In its opinion, the Supreme Court described conduct that falls outside the boundary line of § 523(a)(6). But it did not define the boundary line with any precision or directly address the more general question whether malice can exists short of a specific intent to injure (e.g., whether it can be inferred from the substantial certainty that the conduct will cause harm). Because the Supreme Court did not speak clearly and unambiguously on the issue, it is appropriate that this court, as a trial court, continue to follow the precedent of the Court of Appeals in this Circuit. *See In re Stuart,* 367 B.R. 541, 550 (Bankr.E.D.Pa. 2007) (applying same principle to arguable tension in appellate case law involving the *Rooker–Feldman* doctrine).

19. Some courts ascribe the requirement that there be a specific intent to cause harm or a substantial certainty of harm to the "willfulness" requirement while other courts treat this requirement as part of the "malice" requirement. Either way, the requirement exists.

absence of personal hatred, spite or ill-will. *See Tinker v. Colwell,* 193 U.S. at 486, 24 S.Ct. at 508. In the abstract, the concepts of "wrongfulness" and "without just cause" seem very broad. Indeed, virtually every judicial liability determination is based on a party's having taken some action he should not have taken (or failed to take some action that he or she should have taken). In some sense, then, a judicial liability determination is always based on "wrongful" conduct. How then to distinguish between wrongful conduct that is dischargeable and wrongful conduct that is nondischargeable under § 523(a)(6)?

■ There is surprisingly little judicial and scholarly commentary discussing the degree or nature of "wrongfulness" that constitutes "malice" under 11 U.S.C. § 523(a)(6). The best analysis on the question that I have located is in *In re Long,* 774 F.2d 875, 881 (8th Cir.1985) (emphasis added), a decision that, in the course of its analysis, anticipated the Supreme Court's holding in *Geiger:*

> Congress tells us in § 523(a)(6) that malice and willfulness are two different characteristics. They should not be lumped together to create an amorphous standard to prevent discharge for any conduct that may be judicially considered to be deplorable. We are convinced that if malice, as it is used in § 523(a)(6), is to have any meaning independent of willful it must apply only to *conduct more culpable than that which is in reckless disregard* of creditors' economic interests and expectancies, as distinguished from mere legal rights. Moreover, knowledge that legal rights are being violated is insufficient to establish malice, absent some additional *"aggravated circumstances,"*

■ The *Long* court's teaching, that conduct must be is "more culpable" or involve "aggravated circumstances" to rise to the level of malice, is helpful. At the same time, the "test" offered in *Long* is not especially specific or concrete. Perhaps the analysis is best understood as an expression of the fundamental policy underlying the bankruptcy discharge: of providing a fresh start only to "the honest but unfortunate debtor." *Grogan v. Garner,* 498 U.S. 279, 286–287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230(1934)). *See also* Margaret Howard, *A Theory of Discharge in Consumer Bankruptcy,* 48 Ohio St. L.J. 1047, 1050–1056 (1987) (referring to discharge being reserved for "honest" and "worthy" debtors and difficulty of applying the standard under § 523(a)(6)). In this respect, the "wrongfulness" component of malice, serves as one of the safeguards against misuse of the Bankruptcy Code. *See generally In re Tamecki,* 229 F.3d 205, 207 (3d Cir.2000) (referring to use of good faith requirement to prevent abuse of the provisions, purpose, or spirit of bankruptcy law); Leif M. Clark & Sharron B. Lane, *Having Good Faith in Good Faith Analysis,* 683 Commercial Law & Practice Course Handbook Series 669, 676 (1994) (referring to use of good faith doctrine in preventing debtors from achieving "reprehensible purposes").

With these principles in mind, I turn to the facts in this proceeding.

## B. The Findings of the State Court

In *Jacobs I,* after the trial on liability, the Trial Court made 116 findings of fact and then discussed those facts in detail in its opinion. In *Jacobs II,* the Trial Court made 163 findings of fact and followed the same process, then discussing those facts in detail in its opinion.

In *Jacobs I,* the Trial Court considered three (3) claims Viener raised against the Debtor: (1) wrongful discharge; (2) con-

spiracy; and (3) breach of fiduciary duty. The Trial Court dismissed the first two (2) claims, but found in Viener's favor on the breach of fiduciary duty claim.

In ruling in Viener's favor and determining that he was entitled to both compensatory and punitive damages, the Trial Court found that (1) the Debtor, in concert with other shareholders acted as a majority shareholder in NGN and RGC, (2) therefore, owed a fiduciary duty to Viener as a minority shareholder and (3) breached that fiduciary duty. *Jacobs I,* 51 D. & C.4th at 281–96.[20] In sum, the court found that the Debtor "squeezed Viener out of NGN and RGC" and "left him with an interest in a corporate shell." *Id.* at 295. The court found that this was accomplished by "fraud, self-dealing, self-interest and misconduct by [the Debtor]." *Id.* at 282.

To evaluate the merits of Viener's collateral estoppel argument, it is helpful to identify the conduct upon which the Trial Court based its decision. Set forth below is a summary of its most significant findings:

- Viener served as president of NGN from its inception until August 1994, during which time the company grew dramatically. The company was consistently profitable through 1992. *Id.* at 268–69 (Findings of Fact Nos. 27, 32).

- As an owner and investor of NGN and RGC, Viener had access to detailed information regarding the companies' operations and performances and to all of the facilities and employees. *Id.* (Findings of Fact Nos. 28–30).

- In 1994–95, the Debtor orchestrated the payment by NGN of more than $50,000 to a subcontractor, Crown Globe, Inc. based on phony invoices, as a means of funneling NGN funds to the Debtor's associate, Ms. Van Vu and unsuccessfully attempted to do the same for an additional $48,135.61. *Id.* at 272–74 (Findings of Fact Nos. 56–73).

- After Viener questioned the propriety of the Crown Globe payments, he was terminated from his employment at NGN, but remained as a director. *Id.* at 274–76 (Findings of Fact Nos. 74, 78–80, 87).

- After Viener's termination, NGN ceased holding regular board meetings, Viener was denied physical access to the company facilities and to information about company activities (other than quarterly and annual financial statements). *Id.* at 275 (Finding of Fact Nos. 82–86).

- In late 1995, the Debtor caused NGN to pay the costs of trips to Mexico designed to assist him and Ms. Van Vu in setting up a manufacturing facility to be owned by them. Initially, he caused NGN equipment to be loaned to a Mexican company called Amex.[21] The Debtor also withdrew over $200,000 out of his loan account from NGN, without the prior consent or knowledge of Viener, for the purchase of the equipment that had been shipped to Amex. *Id.* at 276 (Findings of Fact Nos. 91–97, 99).

- In 1997, the Debtor and Ms. Van Vu bought Kimmex, a facility in Mexico,

---

**20.** In its opinion affirming the Trial Court's decision on liability, the Pennsylvania Superior Court described the finding as follows: "the trial court concluded that Jacobs, as majority shareholder, owed a fiduciary duty to Viener, as minority shareholder, and that

Jacobs' conduct in 'freezing out' Viener was outrageous and oppressive." *Jacobs III,* 834 A.2d at 553.

**21.** The Trial Court never established who owned Amex.

for themselves. The Debtor transferred the equipment located at Amex, including $15,730 worth of equipment owned by NGN, to Kimmex. NGN never got the equipment back, was not paid for it, nor received any benefit or thing of value from Kimmex. Viener also was not given an opportunity to invest in Kimmex. *Id.* at 277 (Findings of Fact Nos. 98, 100–104).

- Also in 1997, Rush and Friedman stopped accepting orders for NGN and RGC, even though the companies were viable as going concerns. At least part of the reason for this decision was the lawsuit Viener had filed in the Trial Court in February 1995. Although a turnaround specialist had opined that NGN could survive, the decision to terminate operation was made without any presentation of this information to NGN's board and shareholders. *Id.* at 278–79 (Findings of Fact Nos. 107–110, 114). *See also Jacobs II*, 52 D. & C.4th at 356 (Finding of Fact No. 5).

In *Jacobs II*, the Trial Court summarized its conclusions concerning the causes of the demise of NGN as follows:

After Viener's termination, company officers made a series of critical decisions which contributed to the failure of the business and in which Viener did not participate, including: (1) a determination to borrow substantial additional monies from local banks; (2) the adoption of annual business plans which called for sales substantially in excess of the company's past experience-plans which were never adjusted to changing market conditions; (3) the adoption of inventory practices, including, but not limited to, the manufacture by Ms. Van Vu and stockpiling of substantial quantities of inventory months in advance of sales; (4) the build-up of an excessive $7 million in inventory; (5) ceasing to take orders for sales of garments; (6) agreeing that an off-shore subsidiary was important to NGN's future success, but allowing such facility to be set up and totally owned by Jacobs and Ms. Van Vu; and (7) electing to close the company's doors despite the fact that the company remained viable. All of the foregoing had a substantial negative impact on NGN's prospects.

*Jacobs II*, 52 D. & C.4th at 356.

Finally, relevant to the dischargeability determination in this court are the following findings made by the Trial Court in holding the Debtor liable to Viener for compensatory and punitive damages:

- The Debtor "continuously disregarded his fiduciary duties to minority shareholder Viener and subordinated those legal duties to his personal relationship with [Ms. Van Vu] … who is now [the Debtor's] 'partner' in two apparel companies…." *Id.* at 360 (Finding of Fact No. 36).

- The Debtor's "covert diversion of NGN's cash, equipment, machinery and financial resources for his own self-interests caused or contributed to the destruction of Viener's interests in the profitable apparel businesses founded or capitalized by Viener's family." *Id.* at 388 (Conclusion of Law No. 2). The Debtor's conduct in "diverting NGN's cash, equipment, machinery and financial resources to Ms. Van Vu and the offshore facility they own together is outrageous." *Id.* at 389 (Conclusion of Law No. 10).

- A principal harm caused by the misconduct of [the Debtor] was the destruction of the total value of Viener's ownership interest in NGN and related entities. *Id.* at 367 (Finding of Fact No. 84)

## C. Collateral Estoppel Applies In This Proceeding

■ The doctrine of collateral estoppel is applicable in bankruptcy proceedings under 11 U.S.C. § 523(a) involving the dischargeability of a debt. *Grogan v. Garner*, 498 U.S. 279, 285, 111 S.Ct. 654, 658, 112 L.Ed.2d 755 (1991). The use of a prior state court decision to preclude the relitigation of issues in a subsequent federal proceeding is grounded in 28 U.S.C. § 1738, which provides:

> ". . . Acts, records and judicial proceedings [of any court of a State, Territory, or Possession of the United States] shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."

■ Under § 1738, I look to Pennsylvania law to determine the preclusive effect, if any, of the findings in the Viener Litigation.[22] Under Pennsylvania law, collateral estoppel applies when:

(1) an issue is identical to one that was presented in a prior case;

(2) there has been a final judgment on the merits of the issue in the prior case;

(3) the party against whom the doctrine is asserted was a party in, or in privity with a party in, the prior action;

(4) the party against whom the doctrine is asserted, or one in privity with the party, had a full and fair opportunity to litigate the issue in the prior proceeding; and

(5) the determination in the prior proceeding was essential to the judgment. *E.g., Cohen v. Workers' Comp. Appeal Bd. (City of Philadelphia)*, 589 Pa.498, 909 A.2d 1261, 1264 (2006); *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 245–246 (3d Cir.2006); *In re Randall*, 358 B.R. 145, 164 (Bankr.E.D.Pa. 2006).[23]

■ There is no serious question that four (4) of the five (5) requirements discussed above are satisfied with respect to the factual findings summarized above in Part IV.B. The same parties are involved in both proceedings. The findings of the Trial Court are final.[24] Given the

---

**22.** *See, e.g., National R.R. Passenger Corp. v. Pennsylvania Public Util. Comm'n*, 342 F.3d 242, 254 (3d Cir.2003) ("a federal court generally must give deference to a state court judgment, granting the same preclusive effect to a state-court judgment as another court of that State would give"); *Walzer v. Muriel, Siebert & Co., Inc.*, 221 Fed.Appx. 153, 155 (3d Cir.2007) (unpublished); *In re Titus & McConomy, LLP*, 375 B.R. 165, 172–173 (Bankr.W.D.Pa.2007); *In re Dawley*, 312 B.R. 765, 775 (Bankr.E.D.Pa.2004).

**23.** I am aware of the Pennsylvania and federal decisions applying Pennsylvania law that have employed only a four-part test in applying collateral estoppel rather than the five-part test set forth above in the text. The difference between the two tests is that the the "four-part test" does not include the "fifth element" (*i.e.*, that the prior determination was "essential to the judgment"). *Compare*

*Greenway Ctr. v. Essex Ins. Co.*, 475 F.3d 139, 147 (3d Cir.2007); *Greenleaf v. Garlock*, 174 F.3d 352, 357–58 (3d Cir.1999); *Tucker v. Philadelphia Daily News*, 577 Pa. 598, 848 A.2d 113, 119 n. 11 (2004) *with Graham v. City of Philadelphia*, 402 F.3d 139, 144 n. 5 (3d Cir.2005); *National R.R. Passenger Corp. v. Pa. Public Utility Comm'n*, 342 F.3d at 252; *Office of Disciplinary Counsel v. Kiesewetter*, 585 Pa. 477, 889 A.2d 47, 50–51 (2005).

In this case, I will assume *arguendo* that the "fifth element" is essential to the application of collateral estoppel in Pennsylvania. Since, as explained below, I find that the "fifth element" is satisfied here with respect to the facts necessary to establish the nondischargeability of the Debtor's debt to Viener, it is not necessary to determine whether it is an essential requirement.

**24.** The findings made in the liability phase of the trial are no longer subject to appeal.

length of the trial and the affirmance of the Trial Court's decision on appeal, the Debtor obviously had a full and fair opportunity to litigate the factual issues in state court. And, assuming *arguendo* that collateral estoppel requires that the issues determined in the prior proceeding were essential to the judgment, *see* n. 23, *supra*, the findings concerning the Debtor's misconduct were essential to the Trial Court's determination that he breached his fiduciary duty to Viener.[25]

The Debtor argues that collateral estoppel is inapplicable because he contends that the issues in the prior action are not identical to those in the instant proceeding. In support of this argument, the Debtor cites *In re Ingui*, 2006 WL 637139 (Bankr. E.D.Pa. Mar. 10, 2006) for the proposition that "as a matter of law, a state court's finding that a debtor breached a fiduciary duty by intentionally engaging in misconduct does not estop the bankruptcy court from considering whether the elements of [§ 523(a)(6)] apply." *See* Debtor's Brief In Opposition to Viener's Motion for Summary Judgment at 2–3. In response, Viener argues that the Debtor distorts the holding in *Ingui* because it involved the court's refusal to apply facts derived from "deemed admissions" in the prior proceed-

ing, not factual determinations made after a trial.

I need not settle the parties' debate regarding the meaning of *Ingui*. Even if the Debtor has accurately cited the holding of the case, it does not bar consideration of the Trial Court's findings through collateral estoppel.

 The Debtor cites *Ingui* for the proposition that a state court judgment for breach of fiduciary duty, by itself, cannot support the entry of summary judgment in a nondischargeable proceeding under 11 U.S.C. § 523(a)(6). Regardless whether that is an accurate statement of the law, it is beside the point because the Debtor misapprehends the analytic methodology that Viener asks this court to employ. Viener is not arguing that he is entitled to summary judgment in this proceeding based on nothing more than the Trial Court's determination that the Debtor breached his fiduciary duty to Viener. Rather, Viener asserts that the detailed findings made by the Trial Court are preclusive in this proceeding and mandate a finding of nondischargeability under § 523(a)(6). Viener asks this court to do nothing more than consider the Trial Court's findings and, accepting them as true, determine independently whether the findings establish the elements of nondis-

While the parties have not advised this court whether the damages determination continues to be the subject of an appeal, the pendency of such an appeal would not affect the finality of the Trial Court's findings for purposes of collateral estoppel. *See, e.g., Shaffer v. Smith*, 543 Pa. 526, 673 A.2d 872 (1996); *Philadelphia Fraternal Order of Correctional Officers v. Rendell*, 701 A.2d 600 (Pa.Cmwlth. 1997); *In re McGinley*, 2002 WL 1205033, at *5 & n. 7 (Bankr.E.D.Pa. May 14, 2002)

**25.** As the Superior Court stated in *Viener III*:

[M]ajority shareholders have a duty not to use their power in such a way to exclude minority shareholders from their proper

share of benefits accruing from the enterprise. Pennsylvania law holds that an attempt by a group of majority shareholders to "freeze out" minority shareholders for the purpose of continuing the enterprise for the benefit of the majority shareholders constitutes a breach of the majority shareholders' fiduciary duty to the minority shareholders.

834 A.2d at 556 (citations omitted).

All of the facts I have cited in Part IV.B. were woven into the fabric of the Trial Court's application of the law concerning the duties of majority shareholders to minority shareholders in closely held corporations. Without those findings, the Trial Court could not have sustained Viener's claim.

chargeability under § 523(a)(6). Insofar as the Trial Court's findings are relevant under 11 U.S.C. § 523(a)(6), the issues in the two proceedings are identical and the methodology suggested by Viener is a perfectly appropriate application of the collateral estoppel doctrine.[26] Collateral estoppel undoubtedly applies in dischargeability proceedings, *see Grogan*, 498 U.S. at 285, 111 S.Ct. at 658, and Viener is entitled to try to prove his case under § 523(a)(6) in this fashion.[27] Thus, the Debtor has not

presented any meritorious basis for not applying collateral estoppel in this proceeding.[28]

## D. The Trial Court's Findings Satisfy the Requirements of § 523(a)(6)

■ The last inquiry is whether the Trial Court's findings, applicable in this proceeding through the collateral estoppel, satisfy the elements for a determination of nondischargeability under § 523(a)(6). Those elements are that the

---

26. There are three distinct ways a party could make the argument that a prior state court judgment lacking detailed factual findings compels a finding of nondischargeability in the bankruptcy court that should not be confused. First, a party might argue that the entry of the judgment on a breach of fiduciary duty claim *per se* mandates a finding of non-dischargeability under 11 U.S.C. § 523(a). That would be a request to apply the doctrine of res judicata. Such a request would be without merit as it is well established that res judicata does not apply in a dischargeability proceeding in bankruptcy. *See, e.g., In re Graham*, 973 F.2d 1089, 1093 (3d Cir.1992); *Gallo v. Tooley*, 2007 WL 1071945, *2 (Bankr. D.N.J. Apr. 3, 2007); *Granoff*, 2006 WL 1997408, at *6.

Alternatively, a party might argue that, even though there were no detailed findings in the prior proceeding, the issues that were necessarily resolved in the prior proceeding satisfy all of the elements of the dischargeability claim being asserted in the bankruptcy court. This argument invokes the doctrine of collateral estoppel. In such a case, where no detailed findings were made in the prior proceeding, application of collateral estoppel could result in the entry of judgment for the party that prevailed in the prior proceeding, provided that: (1) the bankruptcy court can determine with precision from a review of the pleadings and the record what issues were actually litigated and determined in the prior proceeding and (2) the legal standards employed under state law in the prior proceeding is congruent with the standards under the applicable provision of 11 U.S.C. § 523(a). Illustrations of this variant of the application of collateral estoppel can be found in *In re Dawley*, 312 B.R. 765 (Bankr.E.D.Pa.2004)

and *In re Harland*, 235 B.R. 769 (Bankr. E.D.Pa.1999).

Significantly, the instant case involves neither of the situations described above because the Trial Court made detailed findings in the prior proceeding.

27. If the Debtor is suggesting that *Ingui* holds that collateral estoppel does not apply in a § 523(a)(6) proceeding, he has misread the case and is mistaken.

28. In his opposition papers to the Motion, the Debtor incorporated by reference the argument he presented in opposition to application of collateral estoppel in connection with the plaintiff-trustee's motion for summary judgment in the § 727 AP. *See* Debtor's Brief In Opposition to Viener's Motion for Summary Judgment at 2. Although this advocacy approach made it difficult to ascertain the Debtor's precise argument, nothing in my review of the Debtor's brief in the § 727 AP persuades me that collateral estoppel is inapplicable.

In the § 727 AP, the Debtor argued that issues determined by the Trial Court should not be accepted as binding in the bankruptcy proceeding because the Trustee failed to identify the purportedly binding factual findings with specificity, making it impossible to determine if the issues in the two proceedings were identical. *See* Debtor's Brief in Opposition to the Trustee's Motion for Summary Judgment at 9 (Adv. No. 02–2087, Docket Entry No. 47). Perhaps, the Debtor is asserting that the same defect applies to Viener's Motion. If so, I reject the argument. It is perfectly obvious which Trial Court findings form the basis of Viener's request for summary judgment on his § 523(a)(6) claim and I have identified those findings in Part IV.B., *supra*.

debt arose from an injury to Viener that was: (1) willful (*i.e.*, involving deliberate and intentional conduct), (2) malicious (*i.e.*, wrongful) and (3) intended or substantially certain to cause injury. *See* Part IV.A., *supra.* Based on the findings of the Trial Court, I conclude that all three (3) elements have been met.

There is no serious question that the first element is satisfied. The Debtor's role in the affairs of NGN, RGC, Kimmex and related entities obviously involved actions that were voluntary and deliberate on his part.

Next, given the Trial Court's findings that the Debtor's conduct involved "fraud, self-dealing, self-interest and misconduct," *Jacobs I*, 51 D. & C.4th at 282, I conclude that the Debtor acted in a wrongful manner. This conclusion is not based solely on the Trial Court's finding that the Debtor breached his fiduciary duty to Viener.[29] Rather, I have considered the specific nature of the Debtor's conduct in causing injury to Viener. In this the Trial Court found, the Debtor's tortious conduct was accomplished, to a significant degree, by a covert diversion corporate assets to the detriment of a minority shareholder, *see Jacobs II*, 52 Pa. D. & C.4th at 388, and was "outrageous" in numerous ways, *see Jacobs I*, 51 Pa. D. & C.4th at 263, 274, 293, 296, 298. The Trial Court's findings describe the type of "wrongful" conduct that constitutes "malice" under § 523(a)(6).[30]

Finally, with respect to the third requirement—the Debtor's intent—the Debtor contends that an issue of fact exists that precludes the entry of summary judgment. In particular, he argues that he could not have intended to harm Viener

because he suffered a comparable loss from the demise of NGN and RGC:

> Section 523(a)(6) ... only applies if [the Debtor] intended to cause the injury in question—the destruction of the companies. Of course, such a conclusion is ludicrous. [The Debtor] himself would lose a substantial amount of money if the companies were destroyed. [The Debtor] has denied that he had any intent to injure Viener or the companies. Jacobs Aff. at 5.

[The Debtor] and Viener both held the same amount of stock in the companies. Both had been shareholders and officers since the inception of the companies. When difficulties between the shareholders arose, [the Debtor] initially voted only to replace Viener as president and voted to allow him to retain his same salary as a vice president; at the same time, his fellow shareholders wanted Viener fired. Only after Viener would not perform his duties as an officer of the corporation did [the Debtor] vote to remove Viener as an officer of the companies. Viener was replaced as president by Michael A. Joffred, who had been the company's external auditor.

After Viener was terminated, he, without the consent of his fellow shareholders, withdrew his personal guarantees of the over $3 million of the company's debt. [The Debtor] never attempted to prevent Viener from withdrawing his personal guarantees. Rather than attempting to block Viener from withdrawing his guarantees and effectively refusing to stand behind the companies, [the Debtor] guaranteed over $3 million in corporate debt, even agreeing to per-

---

**29.** In other words, I am not suggesting that every judgment based on a breach of fiduciary duty necessarily is nondischargeable under § 523(a)(6).

**30.** To put it in the terms employed by the *Long* court, the Debtor's conduct, including the covert diversion of corporate assets, involved "aggravated circumstances."

sonally guarantee another $750,000, while the company's debt was being restructured. Miravich Dec. at 7.

> If [the Debtor] was attempting to injure the companies and Viener, then he must be a masochist. [The Debtor] lost well in excess of $1 million trying to save the companies. Interestingly, for every dollar Viener's stock fell, so did [the Debtor's]. Moreover, [the Debtor's] loan account with the companies—the monies that the companies owed the shareholders—far exceeded Viener's or any other shareholder. Therefore, [the Debtor] himself would be injured to an even greater extent than Viener if the companies failed.

Debtor's Brief In Opposition to Viener's Motion for Summary Judgment at 7.[31]

I am not persuaded by the Debtor's argument for two reasons.

The Debtor glosses over the Trial Court's findings relating to his attempted theft of corporate opportunity. The Trial Court saw a pattern in the evidence presented and found that the Debtor tried to develop the value the of companies that he and Ms. Van Vu controlled exclusively at the expense and to the detriment of NGN and RGC. Thus, while the Debtor's actions may have impaired the value of his own interests in NGN and RGC, had the Debtor succeeded in his efforts, the going concern value of NGN and RGC would have been transferred to entities in which the Debtor had an interest but Viener had none. There was a substantial certainty that the net result of the scheme would have been to harm Viener, but not the Debtor. Thus, a finding of the requisite intent to injure Viener does not require an illogical "masochism" on the part of the Debtor, as he suggests.[32]

---

**31.** The Debtor cites to paragraph 5 of the affidavit he submitted in opposition to the Trustee's Motion for Summary for Summary Judgment in the § 727 AP. Paragraph 5 states:

> I fully informed my counsel at the time, Cozen & O'Connor, that the other shareholders of the companies were having discussions regarding removing Viener as an officer and employee of the companies. We provided counsel with all of the facts including Viener's performance as the president of the companies. Counsel advised us that we had the authority to vote Viener out of office and terminate him as an employee. We were told that our obligations to him were to provide him with records upon request, which we complied with, and to invite him to all Board meetings, which we also complied with. *I took the action not to injure Viener or the companies, but instead to save the companies by putting professional management in place.*

(emphasis added).

To the extent that the Debtor also argues that he could not have been acting "willfully and maliciously" because he acted in good faith on the reliance of counsel in terminating Viener as an employee and controlling Viener's access to company information, he over-

looks the fact that this conduct relating to corporate governance, while not insignificant, formed only a part of the basis for the Trial Court's imposition of liability. The Debtor's control of NGN and RGC in their transactions with NV Sportswear, Kimmex and Amex and the inappropriate nature of those transactions were at least equally the basis of the Debtor's culpability and liability to Viener. The Debtor does not attempt to assert a "reliance on counsel's advice" defense in connection with those transactions. I do not find that surprising.

**32.** I am cognizant that the demise of NGN and RGC did not occur exclusively due to the Debtor's breach of fiduciary duties. Certainly, there were other contributing factors. *See Jacobs II*, 52 D. & C.4th at 356 (referencing seven (7) causes, including bad business judgments made by management). However, as I read the Trial Court decision, the court implicitly found that the Debtor's breach of fiduciary duty was a substantial contributory factor. Put another way, there was a proximate causal relationship between the Debtor's willful and malicious conduct and the injury suffered by Viener. This is sufficient under 11 U.S.C. § 523(a)(6).

In addition, to some extent, "the medium is the message." It is quite striking that in explaining why his actions were innocent and taken in good faith, the Debtor marshals various facts that were already presented, considered and rejected by the Trial Court. Acceptance of the Debtor's spin on the facts would require relitigation of issues already determined adversely to him by Trial Court. As discussed in Part IV.C. above, the Debtor is precluded from relitigating those issues, all of which were integral to the Trial Court's determination of liability based on the Debtor's breach of fiduciary duty to Viener.

■■■ The Debtor's conduct giving rise to his liability for breach of fiduciary duty either (1) was intended to harm Viener—perhaps as retaliation—for his interference in the Debtor's business operations[33] or (2) was substantially certain to injure Viener's property interest in NGN and RGC.[34] As a whole, the Trial Court's findings can yield no other conclusion.

---

**33.** The Trial Court stated:
 We further find that the majority shareholders' decision to strip from Viener any meaningful role in the companies he co-founded was not made under proper circumstances. Jacobs squeezed Viener out of NGN and RGC, by using seemingly legitimate means, because he wanted Viener to go away quietly. Viener was denied access to information, the facilities and then his proper share of the benefits accruing from NGN and RGC. The majority shareholders *retaliated* against Viener, in part because of this litigation, and left him with an interest in a corporate shell.
 *Jacobs I*, 51 Pa. D & C.4th at 295 (emphasis added).

**34.** By its very nature, conduct amounting to theft of corporate opportunity is substantially certain to harm the shareholders of the corporation whose assets are being diminished.

**35.** Because I find that Viener is entitled to summary judgment under 11 U.S.C. § 523(a)(6), it is not necessary to determine

---

## VI. CONCLUSION

For these reasons, I conclude that Viener has proven his case under 11 U.S.C. § 523(a)(6) and is entitled to the entry of summary judgment in his favor.[35] I will enter an order determining that the Debtor's debt to Viener is nondischargeable under 11 U.S.C. § 523(a)(6).[36]

---

whether the debt is nondischargeable under 11 U.S.C. § 523(a)(4).

**36.** Both the compensatory and punitive awards found by the Trial court are nondischargeable pursuant to 11 U.S.C. § 523(a)(6). *See Muegler v. Bening* 413 F.3d 980, 984 (9th Cir.2005) ("When the awards of compensatory damages and punitive damages are based upon the same conduct, the punitive damages award will be nondischargeable under § 523(a)(6) if the compensatory damages award is found to be nondischargeable"); *In re Scarborough*, 171 F.3d 638, 645 (8th Cir. 1999) (same); *In re Abbo*, 168 F.3d 930, 931–32 (6th Cir.1999) (same); *see also Cohen v. de la Cruz*, 523 U.S. 213, 219–220, 118 S.Ct. 1212, 1217, 140 L.Ed.2d 341 (1998) (based on a textual analysis of § 523(a)(2)(A), holding that any liability arising from the debtor's fraudulent conduct, including treble damages, is nondischargeable).